## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JAY ZOLA and JEREMIAH JOSEPH LOWNEY, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 8:14-cv-00288-JBD-TDT |
| TD AMERITRADE, INC., TD AMERITRADE CLEARING, INC., | ) ) ) | |
| Defendants. | ) ) ) ) | |

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE PUTATIVE CLASS ACTION COMPLAINT AND REQUEST TO TAKE JUDICIAL NOTICE

KUTAK ROCK LLP
1650 Farnam Street
The Omaha Building
 Omaha, Nebraska 68102-2186
 (402) 346-6000

*Of counsel*:

SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York  10019
(212) 839-5300

*Attorneys for Defendants*
*TD Ameritrade, Inc. and*
*TD Ameritrade Clearing, Inc.*

**TABLE OF CONTENTS**

**Page**

I. OVERVIEW ...................................................................................................1

II. COMMON BACKGROUND ........................................................................2

      A.     *Flash Boys*...............................................................................................2

      B.     SEC Regulatory Oversight Of Broker Obligations To Seek Best Execution .........3

      C.     SEC Regulatory Oversight Of Payment For Order Flow .......................................6

      D.     June 17, 2014 U.S. Senate Committee Hearing..................................................8

III. THIS ACTION..........................................................................................10

      A.     The Parties ...............................................................................................10

      B.     The Client Agreement................................................................................11

      C.     Plaintiffs' Allegations ...............................................................................12

IV. ARGUMENT.............................................................................................13

      A.     Standard Of Review ..................................................................................15

      B.     This Action Should Be Dismissed Because Plaintiffs' Breach Of Contract Claim Is Preempted By SLUSA ..............................................................17

              1.     Plaintiffs' Allegations Satisfy SLUSA's "Covered Class Action" Definition .............................................................................20

              2.     Plaintiffs' Claim Is Based On State Law ..................................21

              3.     Plaintiffs' Claim Is Based Upon Allegations That Involve In Substance Misrepresentations Or Omissions Or A Manipulative Or Deceptive Device ...................................................................21

                     a.     Plaintiffs' Allegations Involve In Substance Misrepresentations Or Omissions.................................22

                     b.     Plaintiffs' Allegations Involve In Substance A Manipulative Or Deceptive Device.......................................................26

              4.     Plaintiffs Allege That TD Ameritrade's Conduct Was In Connection With The Purchase Or Sale Of Covered Securities ..................................27

i

C.    This Action Should Be Dismissed Because Plaintiffs' Breach Of Contract Claim Is Preempted By Federal Regulation...........................................................28

    1.    State Law Claims That Conflict With The Purpose And Objectives Of The Federal Regulatory Framework Are Preempted............................29

    2.    Order Flow Payments And Order Execution Are The Subject Of Extensive Federal Regulation ....................................................................31

    3.    Plaintiffs' State Law Claim Conflicts With The Federal Regulatory Framework ....................................................................................................33

D.    Alternatively, This Action Should Be Dismissed  For Failure To State A Breach Of Contract Claim ....................................................................................38

    1.    Plaintiffs Fail To Plead The Existence Of A Contractual Promise...........39

    2.    Plaintiffs Fail To Sufficiently Plead That TD Ameritrade Breached A Promise...................................................................................................40

        a.    Plaintiffs Do Not Assert Any Allegations Regarding The Factors That TD Ameritrade Failed To Consider In Routing Clients' Orders ................................................................................41

        b.    TD Ameritrade's Receipt Of Payment For Order Flow Is Not Inconsistent With Its Best Execution Obligations ........................42

        c.    Plaintiffs' Characterizations Of Public Testimony Provided By A TD Ameritrade Executive Should Not Be Credited............44

        d.    Plaintiffs' Allegations Regarding Statements In *Flash Boys* Should Not Be Credited ................................................................45

    3.    Plaintiffs Fail To Plead Damages Flowing From A Breach Of Contract.....................................................................................................47

V. CONCLUSION.....................................................................................................49

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*168th and Dodge, LP v. Rave Reviews Cinemas, LLC*,
    501 F.3d 945 (8th Cir. 2007) ...........................................................................38

*Arizona v. U.S.*,
    132 S. Ct. 2492 (2012)....................................................................................29

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).......................................................................................15

*Ashford v. Bank of America, N.A.*,
    No. 13-12153, 2013 WL 5913411 (E.D. Mich. Oct. 31, 2013)............................39

*Atencio v. Smith Barney*,
    No. 04 Civ. 5653, 2005 WL 267556 (S.D.N.Y. Feb. 2, 2005) .............................28

*Atkinson v. Morgan Asset Mgt., Inc.*,
    658 F.3d 549 (6th Cir. 2011) ......................................................................23, 25

*Barnett Bank v. Nelson*,
    517 U.S. 25 (1996).........................................................................................30

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...................................................................................15, 16

*Benton v. Merrill Lynch & Co., Inc.*,
    524 F.3d 866 (8th Cir. 2008) ..........................................................................15

*Bibbo v. Dean Witter Reynolds, Inc.*,
    151 F.3d 559 (6th Cir. 1998) ..........................................................................37

*Brehm v. Capital Growth Fin., Inc.*,
    No. 8:07CV315, 2008 WL 553238 (D. Neb. Feb. 25, 2008)...............................19

*Brown v. Calamos*,
    664 F.3d 123 (7th Cir. 2011) ..........................................................................23

*Buckman Co. v. Plaintiff's Legal Committee*,
    531 U.S. 341 (2001).......................................................................................30

*Capital Cities Cable Inc. v. Crisp*,
    467 U.S. 691 (1984).......................................................................................29

*Chadbourne & Parke LLP v. Troice*,
    134 S.Ct. 1058 (2014).....................................................................................28

*Cimino v. FirsTier Bank NA*,
   247 Neb. 797, 530 N.W.2d 606 (1995)....................................................................................19

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000).............................................................................................................30

*Dahl v. Charles Schwab & Co.*,
   545 N.W.2d 918 (Minn. 1996)........................................................................................36, 37

*Dudek v. Prudential Secs., Inc.*,
   295 F.3d 875 (8th Cir. 2002) ...................................................................................... passim

*Eirman v. Olde Discount Corp.*,
   697 So.2d 865 (Fla. Ct. App. 1997)......................................................................................37

*EMS, Inc. v. Chegg, Inc.*,
   No. 8:11cv113, 2012 WL 5412956 (D. Neb. Nov. 6, 2012) ..................................................48

*Estate of Braunstein v. Merrill Lynch, Pierce Fenner & Smith, Inc.*,
   657 N.Y.S.2d 12 (N.Y.App. Div. 1997) ................................................................................37

*Felton v. Morgan Stanley Dean Witter & Co.*,
   429 F. Supp. 2d 684 (S.D.N.Y. 2006).....................................................................................25

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
   458 U.S. 141 (1982).............................................................................................................29

*Freeman Invs., L.P. v. Pac. Life Ins. Co.*,
   704 F.3d 1110 (9th Cir. 2013) ...............................................................................................26

*Geman v. SEC*,
   334 F.3d 1183 (10th Cir. 2003) .............................................................................................32

*Gorog v. Best Buy Co., Inc.*,
   760 F.3d 787 (8th Cir. 2014) .................................................................................................17

*Grawitch v. Charter Comms. Inc.*,
   750 F.3d 956 (8th Cir. 2014) ...........................................................................................47, 48

*Green v. Ameritrade, Inc.*,
   279 F.3d 590 (8th Cir. 2002) ....................................................................................19, 20, 28

*Guice v. Charles Schwab & Co.*,
   674 N.E.2d 282 (N.Y. 1996)..........................................................................................7, 31, 37, 38

*Gurfein v. Ameritrade*,
   No. 01cv9526, 2007 WL 2049771 (S.D.N.Y. July 17, 2007) ..........................................39, 46

*Gurfein v. Ameritrade, Inc.*,
312 F. App'x 410 (2d Cir. Feb. 27, 2009) ........................................................39, 42

*Gurfein v. Ameritrade, Inc.*,
No. 04 Civ. 9526, 2006 WL 2959146 (S.D.N.Y. Oct. 13, 2006) ..............................26, 46, 47

*Hillsborough Co., Fla. v. Automated Med. Labs, Inc.*,
471 U.S. 707 (1985)................................................................................30

*In re Application of Brenner*,
652 N.Y.S.2d 249 (N.Y. App. Div. 1996) .......................................................30

*In re Certain Market Making Activities on NASDAQ*,
68 S.E.C. Dkt 2693, 1998 WL 919673 (Jan. 11, 1999) ..........................................33

*In re K-tel Int'l, Inc. Sec. Litig.*,
300 F.3d 881 (8th Cir. 2002) ....................................................................16

*In re Morgan Stanley & Co., Inc.*,
90 S.E.C. Docket 1625, 2007 WL 1364323 (May 9, 2007) ......................................33

*In re Scottrade, Inc.*,
93 S.E.C. Dkt. 1550, 2008 WL 2510611 (June 24, 2008)........................................32

*In re Van der Moolen Holding N.V. Sec. Litig.*,
405 F. Supp. 2d 388 (S.D.N.Y. 2005)...........................................................27

*In re: Google Inc. Gmail Litig.*,
No. 13-MD-02430, 2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) .............................10

*International Paper Co. v. Ouellete*,
479 U.S. 481 (1987)................................................................................30

*Jaspers v. Prime Vest Fin'l Servs., Inc.*,
No. 10-853, 2010 WL 3463389 (D. Minn. Aug. 30, 2000) ......................................25

*Kenneth Rothschild Trust v. Morgan Stanley Dean Witter*,
199 F. Supp. 2d 993 (C.D. Cal. 2002) ...........................................................25

*Kircher v. Putnam Funds Trust*,
547 U.S. 633 (2006)................................................................................18

*Knights of Columbus Council 3152 v. KFS BD, Inc.*,
280 Neb. 904 (2010) ..............................................................................38, 39

*Kurz v. Fidelity Management & Research Co.*,
No. 07-cv-709, 2008 WL 2397582 (S.D. Ill. June 10, 2008),
*aff'd*, 556 F.3d 639 (7th Cir. 2009)...............................................24, 25, 26, 40

*Kushner v. Beverly Enters., Inc.*,
  317 F.3d 820 (8th Cir. 2003) ................................................................16

*Kutten v. Bank of Am., N.A.*,
  No: 06-0937, 2007 WL 2485001 (E.D. Mo. Aug. 29, 2007),
  *aff'd*, 530 F.3d 669 (8th Cir. 2008)..................................................17

*Kutten v. Bank of Am., N.A.*,
  530 F.3d 669 (8th Cir. 2008) ......................................................... passim

*Levitin v. PaineWebber, Inc.*,
  159 F.3d 698 (2d Cir. 1998)........................................................31, 37

*Mattes v. ABC Plastics, Inc.*,
  323 F.3d 695 (8th Cir. 2003) ...............................................................11

*McDaniel v. Wells Fargo Investments, LLC*,
  717 F.3d 668 (9th Cir. 2013) ...............................................................29

*McKey v. Charles Schwab & Co., Inc.*,
  67 Cal.App.4th 731 (Cal. Ct. App. 1998) ..........................................37

*MDCM Holdings, Inc. v. Credit Suisse First Boston Corp.*,
  216 F. Supp. 2d 251 (S.D.N.Y. 2002)................................................26

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*,
  547 U.S. 71 (2006).......................................................................... passim

*Miller v. Redwood Toxicology Lab., Inc.*,
  688 F.3d 928 (8th Cir. 2012) ...............................................................16

*Myers v. Merrill Lynch & Co., Inc.*,
  No. 98-3532, 1999 WL 696082 (N.D. Cal. 1999),
  *aff'd* 249 F.3d 1087 (9th Cir. 2001)...................................................29

*NASDAQ OMX Group, Inc. v. UBS Secs., LLC*,
  770 F.3d 1010 (2d Cir. 2014)...............................................................34

*Newton v. Merrill Lynch*,
  259 F.3d 154 (3d Cir. 2001)...................................................................5

*Nixon v. Coeur D'Alene Tribe*,
  164 F.3d 1102 (8th Cir. 1999) .............................................................17

*Orman v. Charles Schwab & Co., Inc.*,
  688 N.E.2d 620 (Ill. 1997) .............................................................36, 37

iv

*Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*,
   559 F.3d (8th Cir. 2009) ................................................................................. passim

*Phipps v. Skyview Farms, Inc.*,
   610 N.W.2d 723 (Neb. 2000)........................................................................48

*Prager v. Knight/Trimark Group, Inc.*,
   124 F. Supp. 2d 229 (D.N.J. 2000) ..............................................................25

*Rambo v. Sullivan Re Group LLC*,
   No. A-05-1020, 2007 WL 2122172 (Neb. Ct. App. July 24, 2007) ........................................48

*Securities Indus. Ass'n v. Connolly*,
   883 F.2d 1114 (1st Cir. 1989) ......................................................................30

*Segal v. Fifth Third Bank, N.A.*,
   581 F.3d 305 (6th Cir. 2009) .............................................................15, 23, 25

*Shulick v. PaineWebber, Inc.*,
   722 A.2d 148 (Pa. 1998) ........................................................................35, 36

*Siepel v. Bank of Am.*,
   239 F.R.D. 558 (E.D. Mo. 2006),
   *aff'd* 526 F.3d 1122 (8th Cir. 2008).............................................................. passim

*Silver v. H&R Block, Inc.*,
   105 F.3d 394 (8th Cir. 1997)...........................................................................9

*Sofonia v. Principal Life Ins. Co.*,
   465 F.3d 873 (8th Cir. 2006) .............................................................18, 19, 20, 27

*Stahl v. U.S. Dep't of Agric.*,
   327 F.3d 697 (8th Cir. 2003) ........................................................................11

*Telco Group, Inc. v. Ameritrade, Inc.*,
   No. 8:05-cv-387, 2007 WL 203949 (D. Neb. Jan. 23, 2007),
   *aff'd*, 552 F.3d 893 (8th Cir. 2009)............................................................5, 25, 26

*Tellabs v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..............................................................................2, 16

*U.S. v. Locke*,
   529 U.S. 89 (2000)..................................................................................30

*Williams v. First Nat'l Bank of St. Louis*,
   No. 4:14cv01458, 2014 WL 5800199 (E.D. Mo. Nov. 7, 2014) .......................................13, 17

v

*Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.*,
    341 F. Supp. 2d 258 (S.D.N.Y. 2004)..................................................................26

*Zannini v. Ameritrade Holding Corp.*,
    266 Neb. 492 (2003) .........................................................................................37

## STATUTES

15 U.S.C. § 77(b) .......................................................................................................18

Securities Litigation Uniform Standards Act of 1998, 15 U.S.C. §§ 77p, 78bb................... passim

15 U.S.C. § 78b..........................................................................................................30

15 U.S.C. § 78k-1 ................................................................................................3, 31, 32

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 ....................................13, 18

Securities Act of 1933, 15 U.S.C. § 77a et seq. ............................................................18

Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. ................................................3, 31

## OTHER AUTHORITIES

U.S. Const. Art. VI, cl. 2.............................................................................................1

17 C.F.R. § 242.600(b)(38).........................................................................................3

17 C.F.R. § 240.10b-10 ....................................................................................... passim

17 C.F.R. § 240.10b-5 ...............................................................................................27

17 C.F.R. § 240.11ac1-3 .............................................................................................4

17 C.F.R. § 242.605 ..................................................................................................8

17 C.F.R. § 242.606 ........................................................................................... passim

44 Fed. Reg. 20,360 1979 WL 171078 (Mar. 22, 1979)..................................................5

58 Fed. Reg. 52,934, 1993 WL 403286 (Oct. 6, 1993) ..................................................32

59 Fed. Reg. 55,006-01, 1994 WL 587790 (Nov. 2, 1994).......................................... passim

65 Fed. Reg. 75,414-01, 2000 WL 1721163 (Dec. 1, 2000) ........................................6, 7

71 Fed. Reg. 50,959-01, 2006 WL 3472378 (Aug. 28, 2006) .........................................5

Fed. R. Civ. P. 12(b)(6) ................................................................................................ passim

Fed. R. Evid. 201 ................................................................................................................16

NASD R. 2320 ......................................................................................................................5

FINRA R. 5310 ................................................................................................................ passim

Defendants TD Ameritrade, Inc. and TD Ameritrade Clearing, Inc. (collectively, "TD Ameritrade") respectfully submit this brief in support of their motion to dismiss the Class Action Complaint ("Complaint") filed by plaintiffs Jay Zola and Jeremiah Lowney ("Plaintiffs"). The Complaint should be dismissed pursuant Fed. R. Civ. P. 12(b)(6).

This brief and the briefs that the defendants have submitted contemporaneously in the other four related actions include several parts that are substantially the same or overlapping. To limit, to the extent practicable, burdening the Court with duplicative portions, the defendants have organized their briefs in the five cases into three sections. The initial section (pp. 2 to 10) sets out the common background relevant to all five related actions, and is the same in each of the five briefs. The second section (pp. 10 to 13) provides background particular to this Complaint, and the third section (pp. 13 to 49) sets out TD Ameritrade's arguments specific to this action.

## I. <u>OVERVIEW</u>

At its core, this Complaint, like the complaints in the other four similar actions before this Court, wages a broad attack on TD Ameritrade's receipt of compensation for routing orders to market centers for execution. The compensation is generally called "payment for order flow" and, for certain kinds of market centers, it is called "maker rebates." Like the others, this Complaint is built upon the unsustainable contention that, because TD Ameritrade has received or considered compensation for routing its clients' orders to various market centers, including from venues that allegedly paid the most, this *must* mean that TD Ameritrade has violated its obligation to seek best execution in the routing of its clients' orders. TD Ameritrade's best execution obligation, however, is governed by specific federal regulations that have been developed and studied over several decades by the U.S. Securities and Exchange Commission ("SEC"), and significantly, the SEC has expressly approved the practice of market centers

compensating brokerage firms for order flow and rejected the notion that the consideration or receipt of such payments is a violation of best execution rules, as Plaintiffs suggests here.[1] Plaintiffs' allegations and invocation of state law seek to distract the Court from this long-established federal regulatory framework and from their Complaint's failure to state well-pled allegations of fact to support an assertion that TD Ameritrade failed *to seek* best execution.

## II. COMMON BACKGROUND[2]

### A.     *Flash Boys*.

The five actions before the Court were filed in the wake of the release of Michael Lewis's book *Flash Boys: A Wall Street Revolt* ("*Flash Boys*"), published on March 31, 2014.  Portions of *Flash Boys* purport to describe, in sensational terms, the trading strategies of "high frequency traders" and their intersection with obligations regarding best execution and the long-standing practice of payment for order flow, both of which have been studied at length by the SEC and are the subject of extensive regulation.  *See* Parts II(B)-(C), *infra* (discussing that the SEC's careful policy balance is embodied in SEC Rule 10b-10, Rule 606 of SEC Regulation NMS, and FINRA[3] Rule 5310 (approved by the SEC)).

Neither the Complaint nor *Flash Boys* asserts that TD Ameritrade engages in high

---

[1]     In the remainder of the brief, "payment for order flow" will include maker rebates.

[2]     This Background is drawn from (i) certain allegations of the Complaint, the truth of which is assumed for the limited purpose of this motion, (ii) documents of public record of which this Court may take judicial notice, and (iii) documents incorporated by reference into the Complaint.  *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.").

[3]     FINRA is the commonly used acronym for Financial Industry Regulatory Authority.  FINRA oversees securities brokerage firms and their registered representatives.  As part of its mandate, FINRA enacts rules and publishes guidance in its role as regulator of securities firms and brokers. *See* http://www.finra.org/industry/oversight, last visited March 23, 2015.

frequency trading (the thrust of Mr. Lewis's book), or that TD Ameritrade owns or controls any high frequency trader.

**B.**   **SEC Regulatory Oversight Of Broker Obligations To Seek Best Execution**.

Best execution is the federal regulatory requirement that brokers seek the best execution reasonably available for their clients' orders.  TD Ameritrade is not a market-maker.  When TD Ameritrade receives a client's order to buy or sell a security, it routes that order to a market center for execution.[4]  In doing so, TD Ameritrade is subject to an extensive, federally regulated framework regarding the routing of clients' orders for execution.

The federal regulatory obligations regarding order execution arose out of the 1975 amendments to the Securities Exchange Act of 1934, in which Congress set forth a mandate to maintain "fair and orderly markets."[5]  Thus, over three decades, the SEC has considered, regulated and approved rules regarding best execution obligations and, in that context, has considered and articulated its position on a broker's receipt of payment for order flow (here, a fraction of a penny per routed share).[6]  To that end, the SEC has made or approved

---

[4]      Market centers include market-makers, exchanges, alternative trading systems and other venues where orders are executed.  *See* 17 C.F.R. § 242.600(b)(38).

[5]      In authorizing those amendments, Congress found that it was: "in the public interest and appropriate for the protection of investors and the maintenance of fair and orderly markets to assure (i) economically efficient execution of securities transactions; (ii) fair competition among brokers and dealers, among exchange markets, and between exchange markets and markets other than exchange markets; (iii) the availability to brokers, dealers and investors of information with respect to quotations for transactions in securities; (iv) the practicability of brokers executing investors' orders in the best market; and (v) an opportunity, consistent with the provisions of clauses (i) and (iv) of this subparagraph, for investors' orders to be executed without the participation of a dealer."  15 U.S.C. § 78k-1(a)(1)(C) (2012).

[6]      "Payment for order flow" is broadly defined by SEC Rule 10b-10 to include any monetary payment or other form of compensation to a broker in return for the routing of customer orders.  *See* Payment For Order Flow, Exchange Act Release No. 34,902, 59 Fed. Reg. 55,006-01, 55,008, 1994 WL 587790, at *4 (Nov. 2, 1994) (citing SEC Rule 10b-10(e)(9)).  The "maker-taker model," which involves the payment of liquidity "rebates," is a variation on payment for order flow.  *See id.*  The contents of the Federal Register shall be judicially noticed and without prejudice to any other mode of citation, may be

pronouncements on 1) the periodic regular and rigorous review of execution quality, 2) the permissibility of aggregating orders from all clients in evaluating execution quality, and 3) receipt and disclosure of compensation in connection with the routing of orders.

The SEC's final rule release for Rule 10b-10 and adopting Rule 11Ac1-3, published in 1994, is directly on point. In that release, which reviewed a series of studies and reports between 1977 and 1989 and assessed then-current market developments, the SEC identified several factors to be taken into account by broker-dealers in connection with the routing and execution of customer orders, including, among others, 1) price, 2) order size, 3) trading characteristics of the security involved, and 4) the availability of accurate information affecting choices as to the most favorable market in which execution might be sought.[7]

Obtaining the absolute best price on every order is not the standard for determining whether a broker has met its best execution obligations. Rather, the SEC requires that "the broker endeavor, using due diligence, to obtain the best execution possible given all facts and circumstances." Payment For Order Flow, Exchange Act Release No. 34,902, 59 Fed. Reg. 55,006-01, 55,008 n.26, 1994 WL 587790, at *5 n.26 (Nov. 2, 1994). The SEC has long acknowledged the impracticality for a broker handling a heavy volume of orders to make routing determinations on an order-by-order basis, and thus allows brokers to periodically assess the execution quality of its clients' order flow in the aggregate in meeting its best execution

---

cited by volume and page number." 44 U.S.C. § 1507; accord *Pet Quarters, Inc. v. The Depository Trust & Clearing Corp.*, 545 F.Supp.2d 845, 846 (E.D. Ark. 2008), *aff'd*, 559 F.3d 772 (for use in motion to dismiss); *see also Crimm v. Missouri Pacific Railroad Co.*, 750 F.2d 703, 709-10 (8th Cir. 1984) (same, for use at trial); *Alpharma, Inc. v. Pennfield Oil Co.*, No. 8:03CV401, 2008 WL 1990783, at *9 (D. Neb. May 5, 2008) (Bataillon, J.) (same, for use in motion for summary judgment).

[7]     *See* Payment For Order Flow, Exchange Act Release No. 34,902, 59 Fed. Reg. at 55,008 n.26, 1994 WL 587790, at *5 n.26 (citing to Second Report on Bank Securities Activities: Comparative Regulatory Framework Regarding Brokerage-Type Services 97-98, n.233 (Feb. 3, 1977), as reprinted in H.R. Rep. No. 145, 95th Cong., 1st Sess. 2333 (Comm. Print 1977)).

obligations.  *See id.*; *see also* Development of a National Market System, Exchange Act Release No. 15,671, 44 Fed. Reg. 20,360, 20,366, 1979 WL 171078, at *10 (Mar. 22, 1979).[8]

The factors identified above in the SEC's 1994 final rule release were also set out in NASD Rule 2320—known as the Best Execution Rule—which was approved by the SEC in 2000, amended in 2006 and re-codified in 2012, reflecting the ongoing involvement of federal regulators in this issue.[9]  Effective May 31, 2012, the SEC approved FINRA Rule 5310 (the Rule on "Best Execution and Interpositioning"), which consolidated the best execution requirements for FINRA members (including NASD Rule 2320), and which further detailed the factors for member firms (such as TD Ameritrade) to consider when undertaking their obligation to "use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions."  FINRA Rule 5310(a).  Among the factors that "will be considered in determining whether a [broker] has used 'reasonable diligence' are: (A) the character of the market for the security (e.g., price, volatility, relative liquidity . . .); (B) the size and type of the transaction; (C) the number of markets checked; (D) accessibility of the quotation; and (E) the terms and conditions of the order which result in the transaction[.]"  *Id.*  Pursuant to Rule 5310, a broker is required to have procedures in place to conduct, on a quarterly basis, "regular and

---

[8]      While the SEC has recognized that a broker's compliance with best execution obligations is properly viewed in the aggregate, courts have also recognized that determining whether investors actually failed to receive best execution and suffered damage as a result requires a trade-by-trade analysis.  *See Telco Group, Inc. v. Ameritrade, Inc.*, No. 8:05-cv-387, 2007 WL 203949, at *3 (D. Neb. Jan. 23, 2007) (Bataillon, J.), *aff'd*, 552 F.3d 893 (8th Cir. 2009).  *See also Newton v. Merrill Lynch*, 259 F.3d 154, 178, 180-81 (3d Cir. 2001).

[9]      *See, e.g.*, Order Approving Proposed Rule Change to Amend NASD Rule 2320(a) Governing Best Execution, Exchange Act Release No. 34-54339, 71 Fed. Reg. 50959-01, 2006 WL 3472378 (Aug. 28, 2006) (approving amendments to NASD Rule 2320).  Best execution was also the subject of NASD Notices to Members in 2001 and 2006.  *See NASD Notice To Members 01-22* (April 2001); *NASD Notice to Members 06-58* (Oct. 2006).

rigorous reviews of the quality of the executions of its customers' orders if it does not conduct an

order-by-order review."  *Id.* at Supplementary Material .09(a).  In conducting this review, a

broker "must determine whether any material differences in execution quality exist among

markets trading the security" by comparing factors such as price improvement, likelihood of

execution of limit orders, speed of execution, and transaction costs.  *Id*.

      **C.**      <u>**SEC Regulatory Oversight Of Payment For Order Flow**</u>.

      In its 1994 final rule release, the SEC put to rest the notion that a broker's receipt of

payment for its order flow -- in any amount -- is necessarily inconsistent with meeting its best

execution obligations, as Plaintiffs suggests here.  So long as brokers periodically assess

execution quality and seek best execution of their clients' orders taking into account the relevant

facts and circumstances, those brokers may receive payments for order flow:

> Although *it may be impractical for a broker or dealer that handles a heavy volume of orders to make an individual determination regarding where to route each order it receives*, the broker or dealer must use due diligence to seek the best execution possible *given all facts and circumstances*.  The Commission believes a broker or dealer must assess whether the order flow *in the aggregate*, is receiving best execution and that a broker-dealer must not allow a payment or an inducement for order flow to interfere with its efforts to obtain best execution. Accordingly, in light of a broker-dealer's obligation to *assess periodically the quality of the markets to which it routes packaged order flow* absent specific instructions from customers, *the Commission does not believe such a broker-dealer violates its best execution obligation merely because it receives payment for order flow*.

Payment for Order Flow, Exchange Act Release No. 34,902, 1994 WL 587790, at *6 (emphasis

added).  The SEC has not wavered in this position.  *Accord id.* at *5 n. 28 (SEC "believes that

bulk order routing based, in part, on the receipt of order flow is not, in and of itself, a violation of

[best execution] duties."); Disclosure of Order Execution and Routing Practices, Exchange Act

Release No. 34-43590, 65 Fed. Reg. 75,414-01, 75,420, 2000 WL 1721163, at *12 (Dec. 1,

2000) (same).  The SEC has studied the practice of payment for order flow for several decades,

and has considered the practice to be integral to a functioning market system.  *See, e.g.*, Payment For Order Flow, Exchange Act Release No. 34,902, 1994 WL 587790, at \*8 (banning payment for order flow would "represent a radical change to the industry," and concluding that disclosure is the appropriate response to the issues raised by that practice); *id.* at \*6 ("payment for order flow may result in lower execution costs, facilitate technological advances in retail customer order handling practices and facilitate competition among broker-dealers and securities markets").[10]

To inform clients of the venues to which orders are routed and the payment for order flow that firms receive from individual market centers, the SEC requires particular disclosures regarding the practice.  Pursuant to SEC Rule 10b-10, a broker must disclose in client agreements, account statements and trade confirmations that payment for order flow may be received by the broker for the transaction and, upon written request by the client, must also disclose the source and nature of the compensation received in connection with the particular transaction.  17 C.F.R. § 240.10b-10(a)(2)(i)(C) (2014) (promulgated in 1977, with amendment adding specific reference to payment for order flow in 1994).  The Complaint does not allege that TD Ameritrade failed to make these required disclosures.

In addition, Rule 606 of SEC Regulation NMS requires quarterly disclosure of specified order routing statistics.  TD Ameritrade publishes quarterly reports in accordance with Rule 606 that identify venues to which TD Ameritrade routes orders for execution.  *See* 17 C.F.R. § 242.606 (2014).  Those Rule 606 Reports also disclose, among other things, payment for order flow arrangements with those venues, including a description of the amounts per share or per

---

[10]      *See also generally, e.g.*, *Guice v. Charles Schwab & Co.*, 674 N.E.2d 282, 286-288 (N.Y. 1996) (explaining the history of federal regulations pertaining to payment for order flow).

order that the broker-dealer receives.  *Id.*[11]  The SEC instructs, however, that while statistics in

Rule 606 Reports provide disclosures regarding certain of the factors relevant to order routing

decisions, they are not of themselves determinative of a broker's efforts to seek best execution:

> The Commission wishes to make clear its views as to the limits of these data in
> evaluating a broker-dealer's compliance with its legal duty of best execution.
> Both Rule 11Ac1-5 and Rule 11Ac1-6 are designed to require disclosure pursuant
> to Section 11A of the Exchange Act. They are not antifraud rules, nor do they
> create new duties under the antifraud provisions of the federal securities laws. The
> rules themselves create neither express nor implied private rights of action.
> Furthermore, Rule 11Ac1-5 and Rule 11Ac1-6 do not address and therefore do
> not change the existing legal standards that govern a broker-dealer's duty of best
> execution. The market center reports will provide statistical disclosures regarding
> certain of the factors relevant to a broker-dealer's order routing decision, but these
> factors alone are not determinative of whether the broker-dealer achieved best
> execution.

Disclosure of Order Execution and Routing Practices, Exchange Act Release No. 43,590, 2000

WL 1721163, at *11 (commenting on predecessor to SEC Rule 606).

### D.  June 17, 2014 U.S. Senate Committee Hearing.

In response to *Flash Boys*, a U.S. Senate subcommittee held a hearing on June 17, 2014

regarding high speed trading as well as best execution and payment for order flow.  A number of

industry participants, including Steven Quirk, an executive of TD Ameritrade, were invited to

testify.  The complaints in each of the five actions rely upon and incorporate by reference

portions of Mr. Quirk's testimony, but omit significant portions.

As set forth in the publicly available transcript, Mr. Quirk testified that TD Ameritrade

seeks best execution of its clients' orders by, among other things, considering the factors set out

in FINRA Rule 5310.  Mr. Quirk testified further that, once TD Ameritrade has satisfied itself

that a particular market center meets the regulatory standards for best execution, TD Ameritrade

---

[11]     Under SEC Rule 605 (former Rule 11Ac1-5), the market centers to which TD Ameritrade routes
orders must publicly disclose on a monthly basis, basic standardized information concerning their
handling and execution of orders.  *See* 17 C.F.R. § 242.605.

will then consider transaction costs or revenue opportunities.  Specifically, Mr. Quirk testified in

a colloquy with Senator Levin:

> Senator Levin. Is the size of the rebate offered by an exchange a factor in determining where you route nonmarketable customer orders?
>
> Mr. Quirk. The way that our committees and the people responsible for order routing approach this is they start with the best execution, and they would go through a list of variables that we should consider as hurdles. And in order to get to a point where the revenue sharing is even considered, those hurdles have to be cleared.
>
> Senator Levin. And the revenue sharing that you are talking about is the rebate?
>
> Mr. Quirk. Correct, sir.
>
> Senator Levin. When you get to that point——
>
> Mr. Quirk. Yes.
>
> Senator Levin [continuing]. After you say you have looked at the other factors, and then you look at the rebate issue, my question is: Is the size of the rebate offered by an exchange a factor in determining where you route those nonmarketable customer orders?
>
> Mr. Quirk. Yes. It would be the last factor. All things being equal, that would be a factor.
>
> Senator Levin. And so the greater the rebate, that would be where you would go if it is otherwise best market.
>
> Mr. Quirk. Yes.

(Index of Evidence, Ex. 1 (Declaration of Alex J. Kaplan, ("Kaplan Decl.")), Ex. A, attached

thereto, at 47.)[12]  Mr. Quirk also testified that TD Ameritrade routed orders to a variety of

---

[12]     Exhibit 1.A attached to the Index of Evidence is comprised of excerpts from the official Congressional transcript of the June 17, 2014 hearing before the U.S. Senate Permanent Subcommittee on Investigations of the Committee on Homeland Security and Governmental Affairs relating to the testimony of Mr. Steven Quirk, a TD Ameritrade executive.  The Court may properly consider these excerpts on a Motion to Dismiss because (i) the Complaint embraces and relies upon Mr. Quirk's testimony (*see, e.g.*, Compl. ¶¶ 24-29), and (ii) the Court may take judicial notice of these excerpts because the official transcript is a matter of public record.  *See, e.g., Silver v. H&R Block, Inc.*, 105 F.3d 394, 397 (8th Cir. 1997) (affirming summary judgment on the "alternative ground" that "the district court

exchanges, and some did not pay the highest rate, as reflected in TD Ameritrade's SEC Rule 606

Reports:

> Senator Levin. So, anyway, for virtually every trade, your customers you say were
> better off by your routing their orders to the exchange that paid you a rebate rather
> than a venue that TD Ameritrade would have had to have paid a fee. Is that true?

> Mr. Quirk. I would say in the subsequent 24 months, you will note in our 606s
> that we have routed to a number of exchanges in one quarter, and some of those
> exchanges would not be the exchanges which were paying the highest rate.

(*Id.* at 48.) The complaints in each of the five actions fail to mention the SEC's admonition that

Rule 606 statistics (which identify venues to which orders are routed during a particular quarter)

are not of themselves determinative in assessing a broker's efforts to seek best execution. *See*

Part II(C), *supra*. Rather, contrary to the SEC's warning, the complaints focus on portions of

testimony regarding Rule 606 statistics for select time periods, and a single type of order, and

broadly allege that TD Ameritrade does not seek best execution.

### III. THIS ACTION

#### A.     The Parties.

Defendant TD Ameritrade, Inc. is the third largest securities retail broker-dealer in the

United States. (Compl. ¶¶ 16, 21.) Defendant TD Ameritrade Clearing, Inc. provides trade

execution and clearing services to TD Ameritrade, Inc. (*Id.* ¶ 6.) Plaintiffs contend that they are

customers of TD Ameritrade and are each a party to a client agreement ("Client Agreement")

---

could have granted [defendant's] motion to dismiss rather than convert the motion for summary judgment
. . . [T]he district could have properly considered the complete statements in granting the motion dismiss,"
where "lawsuit is based only on the statements, and [plaintiff] does not dispute their content. *[Plaintiff]
cannot defeat a motion to dismiss by choosing not to attach the full statements to the complaint.* In
considering a motion to dismiss, courts accept the plaintiff's factual allegations as true, but *reject
conclusory allegations of law and unwarranted inferences*.") (emphasis added) (citations omitted); *In re:
Google Inc. Gmail Litig.*, No. 13-MD-02430, 2013 WL 5423918, at*6-7 (N.D. Cal. Sept. 26, 2013)
(taking judicial notice of a public Senate hearing transcript).

with TD Ameritrade.  (*Id.* ¶¶ 4-5, 22; *see also* Index of Evidence Ex. 1.B at § 1.)[13]

**B.     The Client Agreement**.

Upon opening an account and placing orders with TD Ameritrade, Plaintiffs

acknowledged that they each "have received, read and understand [the Client] Agreement and

agree to be bound by its terms."  (Index of Evidence Ex. 1.B § 1.)  Section 8(a) of the Client

Agreement sets forth a number of the factors that TD Ameritrade considers in deciding where to

route stock orders for execution:

> **Order Routing and Executions.**  Unless I [the customer] specify the market for
> execution, you [TD Ameritrade] decide where to route my orders for execution.
> You consider a wide variety of factors in determining where to direct my orders,
> such as, execution price, opportunities for price improvement (which is when an
> order is executed at a price that is more favorable than the displayed national best
> bid or offer), market depth, order size and trading characteristics of the security,
> efficient and reliable order handling systems and market center service levels,
> speed, efficiency, accuracy of executions, and the cost of executing orders at a
> market.

(Index of Evidence Ex. 1.B § 8(a); *see also id.* at § 1 (defining "I," "me," "my" or "account

owner" as any account owner who signs the Account Application, and "You" as

"TD Ameritrade, Inc. . . . and, when applicable, TD Ameritrade Clearing, Inc").)  In Section 8(d)

of the Client Agreement, the client acknowledges that: "You [TD Ameritrade] may receive

remuneration from markets for directing orders to them.  The source and amount of these

payments are available upon written request.  Markets may act as principals to buy, sell or hold

---

[13]     While the Complaint asserts that a copy of the "latest version of the Client Agreement is
attached" to the Complaint as Exhibit A (Compl. ¶ 22 n.3), the version filed with the state court and
served on the TD Ameritrade Defendants did not include an Exhibit A.  TD Ameritrade attaches to the
Kaplan Declaration a copy of the Client Agreement effective as of July 2014.  (*See* Index of Evidence Ex.
1.B.)  This exhibit is properly considered by this Court on a Motion to Dismiss because it is embraced by
the Complaint and relied upon by Plaintiffs as the basis of their claim against TD Ameritrade.  *See Mattes
v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n. 4 (8th Cir. 2003) ("[T]he contracts upon which [a] claim rests .
. . are evidently embraced by the pleadings."); *Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir.
2003) ("In a case involving a contract, the court may examine the contract documents in deciding a
motion to dismiss.").  The relevant terms of the 2014 version are the same as those in the 2011 and 2012
versions of the Client Agreement, the period in which Plaintiffs allege trading activity.  (Compl. ¶¶ 4-5.)

securities for their own accounts, and they may make money when executing your trade." *Id.* §
8(d).

      **C.**    <u>**Plaintiffs' Allegations**</u>.

      Plaintiffs point to the factors identified in Section 8(a) of the Client Agreement and
contend that TD Ameritrade "promised" to consider them when routing client orders. (Compl.
¶¶ 1, 22.) Plaintiffs allege that TD Ameritrade "opportunistic[ally] breaches" the Client
Agreement because it "neither 'consider[s] a wide variety of factors' in order-routing nor routes
its orders in the manner that is best for its customers," but instead "sends virtually all of its
customers' orders to the order internalizer or exchange that pays TD Ameritrade the most money
for its order flow." (*Id.* ¶¶ 2, 24, 48.) Plaintiffs allege that such payments are "kickbacks." (*Id.*
¶ 3.) Plaintiffs also allege that they (and other members of the purported class) suffered
economic injury because TD Ameritrade "knowingly exposed its customers' orders to toxic high
frequency trading" and because they failed to receive best execution from TD Ameritrade. (*Id.*
¶¶ 24, 35.)

      Plaintiffs purport to base their allegations on selected excerpts of testimony by a
TD Ameritrade executive before a U.S. Senate committee, discussed above, *see* Part II(D),
*supra*, and portions of *Flash Boys*. However, the Complaint recites sound bites from *Flash Boys*
that on their face have nothing to do with TD Ameritrade. The only allegations in the Complaint
that purport to connect TD Ameritrade's conduct with high frequency trading are general
assertions that retail brokers route orders to certain market venues that engage in high frequency
trading or then trade with high-frequency traders. (Compl. ¶ 19.) Plaintiffs also allege that,
according to *Flash Boys*, so-called "kickback" payments to TD Ameritrade were made "under
conditions of extraordinary secrecy" and pursuant to "handshake deals," and that "payment for
the order flow is as off-the-record as possible" according to a former employee of

TD Ameritrade.  (*Id.* ¶¶ 3, 25.)  Yet, Plaintiffs also allege that TD Ameritrade published SEC

Rule 606 Reports, which disclose order routing and payment for order flow information.  (*Id.* ¶¶

28-31.)  Ultimately, these limited allegations are about the receipt of "payment for order flow,"

not about any particular involvement by TD Ameritrade with high frequency trading or the

execution of any particular order.  Thus, while Plaintiffs insist this is merely a claim for breach

of contract, they go far beyond that in their allegations of wrongdoing.

       Plaintiffs allege that they made a handful of trades in 2012 (*Id.* ¶¶ 4-5), but they do not

identify a single trade that allegedly did not receive best execution.  Likewise, Plaintiffs do not

identify any exchanges or other venues to which TD Ameritrade supposedly should have routed

orders, or make any plausible allegations that any such other exchanges or venues would have

provided materially better execution on particular trades.

       Plaintiffs purport to bring the Action on behalf of themselves and a Class of "[a]ll

customers of TD Ameritrade, Inc. or TD Ameritrade Clearing, Inc. who placed a non-directed

order with TD Ameritrade, Inc. or TD Ameritrade Clearing, Inc. on or after the date that is five

years prior to filing this complaint."  (*Id.* ¶ 36.)

       Plaintiffs seek to recover "restitutionary damages by requiring TD Ameritrade to

disgorge the profits it has earned from its material and opportunistic breaches of contract."

(Compl.  ¶¶ 33-34.).  Plaintiffs also seek "appropriate declaratory and injunctive relief."  (*Id.* at

p. 15.)

## IV. <u>ARGUMENT</u>

       The Complaint cannot stand as pled and must be dismissed for multiple, independent

reasons.

       *First*, Plaintiffs' breach of contract claim is an improper attempt to artfully avoid the

stringent pleading standard required by the Private Securities Litigation Reform Act of 1995

("PSLRA").  Under the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"),
Congress explicitly required that courts dismiss certain class actions that assert state law claims
arising from securities transactions.  Federal law preempts "covered class actions" based on
allegations involving *either* (i) a misrepresentation or omission of material fact, *or* (ii) the use of
a manipulative or deceptive device, in connection with the purchase or sale of a covered
security.  *See, e.g.*, *Siepel v. Bank of Am.*, 239 F.R.D. 558, 568 (E.D. Mo. 2006), *aff'd* 526 F.3d
1122 (8th Cir. 2008) (dismissing state law claims pursuant to SLUSA, where the "essence of the
Amended Complaint is that Defendants misrepresented and omitted material facts" in connection
with the purchase or sale of a security).  Significantly, when assessing whether SLUSA applies
to the "allegations," the Eighth Circuit instructs that courts "not rely on the names of the causes
of action that the plaintiff alleges.  Instead [courts] look at the *substance* of the allegations, based
on a fair reading.  SLUSA preemption is based on the conduct alleged, not the words used to
describe the conduct."  *Kutten v. Bank of Am., N.A.*, 530 F.3d 669, 670-71 (8th Cir. 2008)
(affirming dismissal of breach of contract and other state law claims as preempted by SLUSA,
and collecting Eighth Circuit authorities) (emphasis added).  Here, Plaintiffs' *allegations* in
support of their breach of contract claim involve in substance misrepresentations or omissions
and manipulative or deceptive devices; thus, this theory of recovery is covered by SLUSA and
must be dismissed.

     *Second*, and alternatively, this action is preempted because Plaintiffs' claim directly
conflicts with the federal regulatory framework that *expressly permits* broker-dealers to route
their orders to market centers in exchange for payment, so long as they comply with federal
regulations on disclosure and order execution.  That regulatory framework arose out of extensive
studies and commentary by the SEC, which determined – and has repeatedly reaffirmed – that a

14

broker does not violate its best execution obligations because it receives payment for order flow. In the 1990's (before the enactment of SLUSA), many courts dismissed state law claims against broker-dealers relating to payment for order flow because they conflicted with—and thus were preempted by—this same federal regulatory framework.  For similar reasons, Plaintiffs' state law claim must also be dismissed as preempted by federal law.

    *Third*, and also alternatively, Plaintiffs do not plead a cognizable cause of action.  The Nebraska Supreme Court has held that, under Nebraska law, a breach of contract claim cannot be premised on an obligation that the defendant was already required under law to perform. Further, although Plaintiffs seek to characterize as a "promise" TD Ameritrade's statement that it "consider[s] a wide variety of factors" in routing orders, the statement is a representation, not a contractual obligation.  Moreover, the Complaint fails to adequately plead any breach of a purported promise or any damages resulting from that breach.

    For all of these reasons, the Complaint should be dismissed with prejudice.

    **A.**    **Standard Of Review**.

    To avoid dismissal of any claim under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  While a complaint is plausible when the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," "[a] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Benton v. Merrill Lynch & Co., Inc.*, 524 F.3d 866, 870 (8th Cir. 2008) (quoting *Twombly*, 540 U.S. at 545); *see also Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S.

at 555-57).  Although the court must accept all *non-conclusory* factual allegations as true, a

complaint must state a claim for relief that rises above the "speculative level."  *Twombly*, 550

U.S. at 555-56.

"[C]ourts must consider the complaint in its entirety, as well as other sources courts

ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents

incorporated into the complaint by reference, and matters of which a court may take judicial

notice."  *Tellabs*, 551 U.S. at 322.  Further, "[w]hen deciding a motion to dismiss, a court may

consider the complaint and documents whose contents are alleged in a complaint and whose

authenticity no party questions, but which are not physically attached to the pleading."  *Kushner*

*v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003) (internal quotation and citation

omitted); *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 889 (8th Cir. 2002) ("The court may

consider, in addition to the pleadings, materials 'embraced by the pleadings' and materials that

are part of the public record.").[14]  *See also Miller v. Redwood Toxicology Lab., Inc.,* 688 F.3d

928, 931, n.3 (8th Cir. 2012) ("While courts primarily consider the allegations in the complaint

in determining whether to grant a Rule 12(b)(6) motion, courts additionally consider 'matters

incorporated by reference or integral to the claim, items subject to judicial notice, matters of

public record, orders, items appearing in the record of the case, and exhibits attached to the

complaint whose authenticity is unquestioned;' without converting the motion into one for

summary judgment." quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and*

---

[14]      Rule 201 of the Federal Rules of Evidence provides for judicial notice of facts "capable of
accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."
Fed. R. Evid. 201(b)(2).  Rule 201 mandates that "[a] court ***shall*** take judicial notice if requested by a
party and supplied with the necessary information." Fed. R. Evid. 201(d) (emphasis supplied).

16

*Procedure* § 1357 (3d ed. 2004)).[15]

Moreover, a court must disregard allegations that are contradicted by the complaint itself or documents supporting them. *See, e.g.*, *Gorog v. Best Buy Co., Inc.*, 760 F.3d 787, 793 (8th Cir. 2014) (affirming dismissal of claim where the plain language of document incorporated by reference into complaint foreclosed liability); *Williams v. First Nat'l Bank of St. Louis*, No. 4:14cv01458, 2014 WL 5800199, at *4 (E.D. Mo. Nov. 7, 2014) ("Courts need not accept as true 'factual assertions that are contradicted by the complaint itself, by documents upon which the pleadings rely, or by facts of which the court may take judicial notice.'") (quoting *Perry v. NYSARC, Inc.,* 424 Fed. Appx. 23, 25 (2nd Cir. 2011)).

For the reasons that follow, the Complaint should be dismissed with prejudice because Plaintiffs have not stated a claim against TD Ameritrade.

###### B.   This Action Should Be Dismissed Because Plaintiffs' Breach Of Contract Claim Is Preempted By SLUSA.

Where a claim is preempted, it is subject to dismissal under Rule 12(b)(6). *See, e.g.*, *Kutten v. Bank of Am., N.A.*, No: 06-0937, 2007 WL 2485001, at *3 (E.D. Mo. Aug. 29, 2007), *aff'd*, 530 F.3d 669 (8th Cir. 2008). This action is preempted by the SLUSA, 15 U.S.C. § 78bb(f)(1), and must therefore be dismissed.[16]

---

[15]      As described herein, TD Ameritrade has attached to its Index of Evidence documents that are embraced by Plaintiffs' Complaint or which the Court can take judicial notice of and properly consider on a Motion to Dismiss. To the extent the Court does not believe these documents can be properly considered on a Motion to Dismiss, TD Ameritrade respectfully requests that the Court disregard these documents. By submitting these documents, TD Ameritrade does not intend to convert this Motion to a Motion for Summary Judgment. *See Nixon v. Coeur D'Alene Tribe*, 164 F.3d 1102, 1107 (8th Cir. 1999) ("In this circuit, Rule 12(b)(6) motions are not automatically converted into motions for summary judgment simply because one party submits additional matters in support of or opposition to the motion.").

[16]      TD Ameritrade removed this action from state court pursuant to SLUSA or, alternatively, the Class Action Fairness Act. *See* Dkt. 1 (providing bases for removal under SLUSA and, alternatively, CAFA). Plaintiffs responded that removal was proper under CAFA, but not under SLUSA, the primary grounds on which TD Ameritrade removed this action. *See* Dkt. 9. On reply, TD Ameritrade stated

SLUSA amended the Securities Act of 1933 and the Securities Exchange Act of 1934

(the "1933 Act" and "1934 Act," respectively) to preclude any action where:

> (1) the action is a "covered class action" as defined in the Act,
>
> (2) the action purports to be based on state law,
>
> (3) the action *alleges* that defendant misrepresented or omitted a material fact (or used or employed a manipulative or deceptive device or contrivance), and
>
> (4) the action *alleges* that the defendant's misrepresentations or omissions of material fact were made "in connection with the purchase or sale of a covered security."

*Sofonia v. Principal Life Ins. Co.*, 465 F.3d 873, 876 (8th Cir. 2006) (citing 15 U.S.C. §§ 77p(b)-

(c), 78bb(f)(1)-(2)) (emphasis added).

SLUSA was enacted to "prevent plaintiffs from seeking to evade the protections that

Federal [securities] law provides against abusive litigation," including the heightened pleading

standards under the PSLRA. *Id.* at 876; *accord Dudek v. Prudential Secs., Inc.*, 295 F.3d 875,

877 (8th Cir. 2002) (SLUSA remedied the unintended result of the PSLRA, which "drove many

would-be plaintiffs to file their claims in state court, based on state law, in order to circumvent

the strong requirements establish by the" PSLRA) (citation omitted).  SLUSA, together with the

1933 and 1934 Acts and the PSLRA, demonstrates that "[t]he magnitude of the federal interest in

protecting the integrity and efficient operation of the market for nationally traded securities

cannot be overstated."  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 78

(2006).  "[T]he Supreme Court instructed that SLUSA should be read with the 'presumption that

Congress envisioned a *broad construction*,' so that the most troublesome class actions would be

---

briefly that SLUSA provides this Court with subject matter jurisdiction over this action and, for the same reasons, preempts this action.  But rather than further brief the SLUSA issue in reply arguments, TD Ameritrade reserved the right to do so in this motion.  *See* Dkt. 19 at 2; *see also Kircher v. Putnam Funds Trust*, 547 U.S. 633, 633-34, 636 (2006) (SLUSA contains both "a preclusion provision and a removal provision," and the preclusion provision in 15 U.S.C. § 77(b) is incorporated into the removal provision in part (c) of the statute).

subject to the PSLRA's procedural reforms." *Siepel*, 526 F.3d at 1122 (citing *Dabit*, 547 U.S. at 86) (emphasis added); *cf. Brehm v. Capital Growth Fin., Inc.*, No. 8:07CV315, 2008 WL 553238, at *2 (D. Neb. Feb. 25, 2008) (Bataillon, J.) ("SLUSA is meant to be construed broadly") (citing *Dabit*). SLUSA's breadth even "pre-empts state-law class-action claims for which federal law provides no private remedy." *Dabit*, 547 U.S. at 74.

Plaintiffs contend that "courts, including the Eighth Circuit, hold that breach-of-contract claims are not subject to SLUSA's reach" (Dkt. 25-1 at 2), but that is not the law. The Eighth Circuit has held that, in applying SLUSA, a court "do[es] not rely on the names of the causes of action that the plaintiff alleges. Instead [it] look[s] at the substance of the allegations, based on a fair reading. SLUSA preemption is based on the conduct alleged, not the words used to describe the conduct." *Kutten*, 530 F.3d at 670-71 (citing earlier Eight Circuit opinions). Thus, the Supreme Court, the Eighth Circuit, and many other courts have held repeatedly that SLUSA preempts actions asserting state law claims – *including those that assert breach of contract claims* – when the above-listed elements are satisfied. *See, e.g.*, *Dabit*, 547 U.S. at 75 (holding that SLUSA barred breach of covenant of good faith and fair dealing claim[17] and other non-fraud state claim); *Kutten*, 530 F.3d at 670 (same, including dismissal of breach of contract claim); *see also Siepel*, 526 F.3d at 1127 (affirming SLUSA preemption of non-fraud claims); *Sofonia*, 465 F.3d at 879-80 (same, as to fraud and non-fraud claims); *Dudek*, 295 F.3d at 879-80 (same).[18]

---

[17]    Under Nebraska law, a breach of the covenant of good faith and fair dealing is akin to a breach of contract. *See Cimino v. FirsTier Bank NA*, 247 Neb. 797, 811, 530 N.W.2d 606, 616 (1995) (explaining that "[t]he implied covenant of good faith and fair dealing exists in every contract" and is inapplicable without "a legally enforceable contractual agreement").

[18]    As explained further on page 28 n.23, *infra*, while the Eighth Circuit in *Green v. Ameritrade, Inc.*, 279 F.3d 590, 598-99 (8th Cir. 2002), declined to dismiss a breach of contract claim pursuant to SLUSA, the allegations in *Green* (regarding a failure to provide real-time stock price information) differed crucially from those asserted here; moreover, the Eighth Circuit's decision turned entirely on the "in connection with" requirement, which was subsequently expanded by the Supreme Court in *Dabit*. *Id.* at

Accordingly, "the critical question is whether [the] complaint can reasonably be read as alleging a sale or purchase of a covered security made in reliance on the allegedly faulty information provided to [Plaintiffs] and to putative class members by" TD Ameritrade. *Sofonia*, 465 F.3d at 877 (quoting *Green*, 279 F.3d at 598). As applied here, the answer to this question is yes. As explained further below, each of the SLUSA requirements is satisfied.

### 1. Plaintiffs' Allegations Satisfy SLUSA's "Covered Class Action" Definition.

SLUSA defines a "covered class action" to be an action in which:

> (I) damages sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate over any questions affecting only individuals persons or members; *or*

> (II) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members[.]

15 U.S.C. §§ 77p(f)(2)(i)(II), 78bb(f)(5)(B)(i)(II) (emphasis added). Thus, "[a] 'covered class action is a lawsuit in which damages are sought on behalf of more than 50 people." *Dabit*, 547 U.S. at 83.

Here, Plaintiffs allege that "they bring [their Action] on behalf of themselves and [a Class]" of "[a]ll customers of TD Ameritrade who placed a non-directed order with TD Ameritrade" within five years of the filing of the Complaint. (Compl. ¶ 36.) Plaintiffs also allege that TD Ameritrade had over 5.9 million funded client accounts at the end of 2013. (*Id.* ¶ 21; *see also generally id.* ¶ 39.) Plaintiffs additionally allege that they seek damages on behalf of

---

598-99; *Siepel*, 526 F.3d at 1127 (limiting *Green* to the extent it is inconsistent with *Dabit*'s broad construction of "in connection with"). That SLUSA requirement is not in dispute in this action, given Plaintiffs' express concession in their consolidation briefing. *See* Dkt 31 at 13 ("It is true that SLUSA also requires proof that the claims relate to the purchase or sale of a covered security, but this is satisfied for all claims in all of the [five] Pending Actions.").

themselves and the Class.  (*Id.* ¶ 49.)  Plaintiffs further allege "questions of law or fact common

to the Class predominate over any questions affecting only individual members."  (*Id.* ¶ 43.)

Accordingly, this action satisfies the "covered class action" definition under SLUSA.[19]

> **2.     Plaintiffs' Claim Is Based On State Law**.

SLUSA requires that the plaintiff's claims be based on state statutory or common law.

*See* 15 U.S.C. §§ 77p(b), 78bb(f)(1).  Here, Plaintiffs purport to assert a breach of contract claim

based on state law.  (*See* Compl. ¶¶ 8 ("The Client Agreement is governed by Nebraska law."),

23 (same), 45-49 (alleging breach of contract claim).)

> **3.     Plaintiffs' Claim Is Based Upon Allegations That Involve In Substance Misrepresentations Or Omissions Or A Manipulative Or Deceptive Device**.

SLUSA also requires that the plaintiff "allege" that defendants either made a

"misrepresentation or omission of material fact," *or* "used or employed a manipulative or

deceptive device or contrivance."  15 U.S.C. §§ 77p(f)(1)(A)-(B), 78bb(f) (1)(A)-(B).  A plaintiff

need not assert a federal securities claim; it is enough that the complaint asserts *allegations* "that

involve" in "substance" misrepresentations, omissions or deceptive device, irrespective of what

law plaintiff asserts is applicable.  *Dudek*, 295 F.3d at 879; *see also Kutten*, 530 F.3d at 670-71.

The Eighth Circuit rejects efforts to avoid SLUSA merely by asserting claims whose elements do

not require proof of fraud.  *Dudek*, 295 F.3d at 879 (rejecting plaintiffs' contention that "SLUSA

does not apply to this case because their complaint did not allege fraud or a misrepresentation or

omission of material fact").  As explained below, Plaintiffs assert allegations that involve in

substance misrepresentations or omissions, as well as allegations that involve in substance a

manipulative or deceptive device, and those allegations – individually and collectively – satisfy

this SLUSA element.

---

[19]     In the event the Court denies this motion, at the appropriate time, the TD Ameritrade Defendants will oppose any motion to certify a class.

a.   *Plaintiffs' Allegations Involve In Substance Misrepresentations Or Omissions*.

"[B]ased on a fair reading" of "the conduct alleged" in the Complaint, Plaintiffs' breach of contract claim is based upon *allegations* within the scope of SLUSA. *Kutten*, 530 F.3d at 670-71 (affirming preemption of breach of contract claim under SLUSA, explaining "we do not rely on the names of the causes of action that the plaintiff alleges").

Plaintiffs' allegations satisfy this SLUSA element because, at bottom, Plaintiffs allege that TD Ameritrade made representations about the factors it considers in routing orders to market centers, but that, in actuality, TD Ameritrade routed orders based on the amount of payment for order flow. Indeed, Plaintiffs introduce their Complaint by stressing what individual investors allegedly did not "know"—a tell-tale sign that their real claim concerns what was (or was not) represented to them. (Compl. at p.1.) The Complaint then stresses language in the Client Agreement that states TD Ameritrade "'consider[s] a wide variety of factors in determining where to direct [client] orders . . .'" (*Id.* ¶ 1.) Plaintiffs go on to allege that, over a five-year period, TD Ameritrade engaged in "material and opportunistic" breaches of the agreement and "blatantly" failed to "consider a wide variety of factors in determining where to direct [client] orders" and, instead, "knowingly exposed its customers' orders to toxic high frequency trading" in order to receive "kickback" payments. (*Id.* ¶¶ 2-3, 22, 24-26, 34-35.) The very definition of the term "kickback" evokes fraud and deception. For example, Merriam-Webster's Dictionary defines "kickback" to be "an amount of *money* that is given to someone *in return for help in a secret and dishonest business deal*."[20]

Plaintiffs suggest that they became aware of this conduct based on portions of *Flash Boys* and public testimony provided by Mr. Quirk. (Compl. ¶¶ 25-27.) Citing to *Flash Boys*,

---

[20]   http://www.merriam-webster.com/dictionary/kickback (last visited Mar. 16, 2015) (emphasis added).

22

Plaintiffs allege that the "kickback" payments to TD Ameritrade were made "under conditions of extraordinary secrecy" and pursuant to "handshake deals," and that "payment for the order flow is as off-the-record as possible."  (*Id.* ¶¶ 3, 25.)  Plaintiffs also contend that, during his public testimony, Mr. Quirk "effectively conceded" that "kickback" payments "overrode every other factor in TD Ameritrade's order routing decisions."  (*Id.* ¶¶ 3, 27.)   Thus, because the "gravamen" of the allegations involve in substance misrepresentations or omissions regarding the way in which TD Ameritrade was making routing decisions of customers' stock orders, SLUSA preempts this action.  *Dudek*, 295 F.3d at 879; *accord, e.g.*, *Kutten*, 530 F.3d at 670-71.

Plaintiffs seek to avoid SLUSA by purporting to disclaim any "claims for . . . misrepresentation[] or violations of the federal securities laws" (Compl. ¶ 37), but the Eighth Circuit rejects such attempts to have the Court ignore the true nature of the alleged conduct.  *See Dudek*, 295 F.3d at 879 (rejecting plaintiffs' contention that "SLUSA does not apply to this case because their complaint did not allege fraud or a misrepresentation or omission of material fact").  "'[A]rtful' disclaimers," like the disclaimer asserted by Plaintiffs, do not impact SLUSA's preemptive force.  *Atkinson v. Morgan Asset Mgt., Inc.*, 658 F.3d 549, 555 (6th Cir. 2011) (affirming dismissal of breach of contract and other state law claims as preempted by SLUSA, reasoning that the "district court rightly analyzed 'the allegations contained in the complaint,' and 'not the state-law label placed on the claim,' in concluding that 'allegations of omissions or other deceitful activity' pervaded each of Plaintiffs' claims. . . . *That the claims did not 'depend' on these allegations is inapposite, as is Plaintiffs' 'artful' disclaimer.*") (citations omitted) (emphasis added); *accord Brown v. Calamos*, 664 F.3d 123, 130-31 (7th Cir. 2011). Indeed, citing to the Eighth Circuit opinion in *Dudek* and other Circuit opinions, the court in *Segal v. Fifth Third Bank, N.A.* explained:

> The question under SLUSA is not whether the complaint uses the prohibited words: "an untrue statement or omission of a material fact" or a "manipulative or deceptive device or contrivance."   It is whether the complaint covers the prohibited theories, no matter what words are used (*or disclaimed*) in explaining them.

581 F.3d 305, 311 (6th Cir. 2009) (emphasis added) (affirming dismissal of breach of contract and other state law claims as preempted by SLUSA); *accord, e.g.*, *Dudek*, 295 F.3d at 879 (plaintiff "may not avoid federal question jurisdiction and the preemption of state law claims by artfully concealing the federal question in an otherwise well-pleaded complaint under state law").  Thus, a plaintiff cannot assert allegations that involve in substance misrepresentations or omissions, and then attempt to disclaim such allegations, particularly where, as here, the allegations involve in substance TD Ameritrade "knowingly" and "opportunistic[ally]" misrepresenting or omitting material facts to clients regarding its order routing processes while making clandestine deals for "kickbacks" in exchange for its clients' order flow.  (*See* Compl. ¶¶ 3, 24-26, 33.)

The case of *Kurz v. Fidelity Management & Research Co.* – upon which Plaintiffs purport to rely (Dkt. 9 at 2, 25-1 at 5) – is instructive.  No. 07-cv-709, 2008 WL 2397582 (S.D. Ill. June 10, 2008), *aff'd*, 556 F.3d 639 (7th Cir. 2009).  In *Kurz*, the plaintiffs alleged that, because the defendants used a broker to execute trades "in return for lavish gifts, rather than on the basis of best execution," the defendants breached "best execution" provisions contained in trade confirmations when executing trades.  *Id.* at *2.  The district court held that the case was "not a simple breach of contract claim, because neither party to the contract ever had any intention of fulfilling that term of the contracts.  Rather Plaintiff's allegations amount to an allegation that the contracts contained a misrepresentation of a material fact."  *Id.* at *4.

As in *Kurz*, when presented with allegations that involve in substance misrepresentations or omissions, courts routinely dismiss breach of contract claims as preempted by SLUSA.  *See,*

*e.g.*, *Kutten*, 530 F.3d at 670-71 (affirming dismissal of breach of contract and other claims);

*Kurz*, 556 F.3d at 642 ("How Fidelity discharges its duties toward investors is a subject requiring

disclosure under federal law."); *Atkinson*, 658 F.3d at 552, 557 (affirming dismissal of breach of

contract and other state law claims as preempted by SLUSA); *Segal*, 581 F.3d at 312 (same);

*Jaspers v. Prime Vest Fin'l Servs., Inc.*, No. 10-853, 2010 WL 3463389, at *6-7 (D. Minn. Aug.

30, 2000) (granting motion to dismiss breach of contract and other claims and denying remand

on SLUSA grounds concerning commissions paid by mutual fund investors, reasoning that,

"[w]hether couched as broken promises or as a different state-law cause of action, however, the

heart of these allegations is a misrepresentation"); *Felton v. Morgan Stanley Dean Witter & Co.*,

429 F. Supp. 2d 684, 693-94 (S.D.N.Y. 2006) ("Plaintiffs describe this conduct [*i.e.*, providing

non-objective investment advice] as a breach by Morgan Stanley 'of the standardized contracts

with the Plaintiffs and Class members,' and so it may have been, but it is also a quintessential

example of a fraudulent omission of a material fact under the federal securities laws."); *Kenneth*

*Rothschild Trust v. Morgan Stanley Dean Witter*, 199 F. Supp. 2d 993, 996 (C.D. Cal. 2002)

(same, as to claims for breach of contract, fraud, negligent misrepresentation, and violations of

California consumer protection statute); *Prager v. Knight/Trimark Group, Inc.*, 124 F. Supp. 2d

229, 234-35 (D.N.J. 2000) (breach of contract and other state law claims removable pursuant to

and barred by SLUSA, where complaint alleged defendant made false and misleading statements

relating to best execution while engaging in a four-year "pattern and practice of trading in

advance of its retail customers and the selling or buying at a profit at the expense of its

customers");[21] *see also Dabit*, 547 U.S. at 74 (affirming dismissal of claim asserting breach of

the implied covenant of good faith and fair dealing).[22]

---

[21]      In addition, this Court's order in *Telco* is not contrary to the foregoing decisions, given the
different allegations and facts at issue.  In *Telco*, the plaintiff, which asserted breach of contract and other

        b.     *Plaintiffs' Allegations Involve In Substance A Manipulative Or Deceptive Device.*

This SLUSA element is additionally (and independently) satisfied because, "based on a fair reading" of "the conduct alleged" in the Complaint, Plaintiffs' allegations involve in substance the use of a manipulative or deceptive device, *i.e.*, "kickbacks" in the form of payment for order flow. *Kutten*, 530 F.3d at 670; Compl. ¶ 3. Plaintiffs allege a purported scheme through which TD Ameritrade sold clients' order flow and purportedly exposed clients to "adverse selection risk as well as electronic front-running, and other toxic high-frequency trading strategies." (*See id.* ¶¶ 15 (citing an April 3, 2014 statement from the retail securities brokerage firm Charles Schwab, which described "the practice of selling preferential access or data feeds . .

---

claims, sought to certify a class of Ameritrade clients whose orders were not executed within four minutes of the time the order was placed, and were ultimately executed at a price worse for the client than the National Best Bid or Offer (NBBO). 2007 WL 203949 at *2-3. The *Telco* plaintiff further alleged that Ameritrade "failed to process cancellation orders and froze customer account funds." *Id.* at *1. There were no allegations regarding payment for order flow. After declining to certify the class, the Court went on to state that SLUSA did not preempt the claims because there were "no allegations of fraud forming the basis of plaintiff's proposed class claim." *Id.* at *11. Here, Plaintiff alleges what are in substance misrepresentations or omissions, and a manipulative and deceptive device, including that TD Ameritrade allegedly did not consider certain factors when routing orders but, instead, allegedly did so solely on the basis of receiving "kickbacks" and "knowingly exposed its customers' orders to toxic high frequency trading." (Compl. ¶¶ 2-3, 22, 24-26, 34-35.)

[22]     Apart from *Kurz* (which supports dismissal of this action), none of Plaintiffs other citations in their removal response and consolidation briefs are availing. *See* Dkt. 9 at 2; Dkt. 25-1 at 5-6. In *Gurfein v. Ameritrade, Inc.*, No. 04 Civ. 9526, 2006 WL 2959146 (S.D.N.Y. Oct. 13, 2006), the court held that SLUSA did not bar breach of contract allegations that "Ameritrade promised to execute plaintiff's orders 'instantaneously, *i.e.*, within seconds' and failed to do so" because that alleged promise "does not rely on, or need, any assertion of misrepresentation or omission." *Id.* at *1; *but see id.* at *3 (dismissing breach of contract claim on alternative failure to state a claim grounds because "materials cited in the [] Complaint fail to support it" and the allegations were "merely conclusory"). Here, in contrast, Plaintiffs contend that TD Ameritrade described its routing of orders for execution in a way that was inaccurate, the very essence of a misrepresentation or omission. *See also Freeman Invs., L.P. v. Pac. Life Ins. Co.*, 704 F.3d 1110, 1116 (9th Cir. 2013) (SLUSA did not bar breach of contract action that turned on meaning of "cost of insurance" charge, which had been assessed monthly pursuant to variable universal life insurance contract). Moreover, with respect to *MDCM Holdings, Inc. v. Credit Suisse First Boston Corp.*, 216 F. Supp. 2d 251 (S.D.N.Y. 2002), Judge Shiendlin later explained in her decision abrogating *MDCM* in part that SLUSA did not apply because none of the state law claims asserted there "require misrepresentations or omissions as a necessary element." *Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.*, 341 F. Supp. 2d 258, 269 (S.D.N.Y. 2004). Thus, *MDCM* – which is not binding on this Court – directly conflicts with Eighth Circuit law. *See Kutten*, 530 F.3d at 670-71; *Dudek*, 295 F.3d at 879.

. and order types that allow high-frequency traders to jump ahead of legitimate order flow" as

"simply ***tools for scamming individual investors***"  (emphasis added)), 20); *cf. generally, e.g.*, *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 405-06 (S.D.N.Y. 2005) (indicating that well-pled allegations of "front-running" and "trading ahead" are "forms of manipulative and deceptive trading practices" under Section 10(b) of the 1934 Act).

For either or both of these reasons, this SLUSA requirement has been satisfied too.

**4.     Plaintiffs Allege That TD Ameritrade's Conduct Was In Connection With The Purchase Or Sale Of Covered Securities**.

Plaintiffs have expressly conceded that the final SLUSA requirement is satisfied: that the Complaint alleges that TD Ameritrade's conduct was "in connection with the purchase or sale of a covered security." *Sofonia*, 465 F.3d at 876 (citing 15 U.S.C. §§ 77p(b)-(c), 78bb(f)(1)-(2)). Indeed, in briefing the various consolidation issues, Plaintiffs wrote:

> It is true that SLUSA also requires proof that the claims relate to the purchase or sale of a covered security, but this is satisfied for all claims in all of the Pending Actions.  At issue is TD Ameritrade's execution of trade orders by its clients for covered securities and whether TD Ameritrade routed those trades properly.

Dkt. 31 at 13.

Plaintiffs' express concession is also supported by the allegations in the Complaint. Plaintiffs contend that they made 13 stock purchases or sales, and they purport to define the Class itself as "[a]ll customers of TD Ameritrade who placed a non-directed [stock] order with" TD Ameritrade.  (Compl. ¶¶ 4-5, 36.)  Thus, the Complaint satisfies SLUSA's broad "in connection with" requirement.  *See, e.g.*, *Dabit*, 547 U.S. at 85 (extending to SLUSA prior "in connection with" precedent in "context of § 10(b) and Rule 10b-5," including broad precedent that "it is enough that the fraud alleged 'coincide' with a securities transaction—whether by the plaintiff or by someone else"); *accord Siepel*, 526 F.3d at 1127 ("the 'in connection with' standard of Section 10(b) is construed flexibly, not technically or restrictively"); *see also*, *e.g.*,

27

*Atencio v. Smith Barney*, No. 04 Civ. 5653, 2005 WL 267556, at *6 (S.D.N.Y. Feb. 2, 2005) ("If, as alleged, defendants' receipt of kickbacks caused defendants to steer class members to certain funds, then those class members' claims for damages from 'retention kickbacks' are inextricably related to their purchases of shares of those funds.") (denying motion to remand and dismissing on SLUSA grounds claims against financial advisors and fund families).[23]

Because, as we have shown, this SLUSA element and all others are satisfied, SLUSA precludes this action, and the Complaint must be dismissed.

### C.     This Action Should Be Dismissed Because Plaintiffs' Breach Of Contract Claim Is Preempted By Federal Regulation.

In addition to preemption by SLUSA, Plaintiffs' breach of contract claim, including their demand for disgorgement of payment for order flow revenues, conflicts with and intrudes upon the federal regulatory framework (as implemented by the SEC) addressing best execution and payment for order flow, and should be dismissed as preempted.  Plaintiffs' claim would require this Court to find as a violation of law conduct that federal regulations do not prohibit.  *See, e.g.*, *Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*, 559 F.3d, 772, 776-77, 780 (8th Cir. 2009) (concerning stock borrower program); *see also*, *e.g.*, Part IV(C)(3), *infra* (collecting cases); *Final Rule: Disclosure of Order Execution and Routing Practices*, 2000 WL 1721163, at *12 ("Furthermore, the Commission believes that the possibility of multiple, inconsistent standards in interpreting this [predecessor Rule 606] information in relation to various state law

---

[23]     *Cf. Chadbourne & Parke LLP v. Troice*, 134 S.Ct. 1058, 1061 (2014) (finding that SLUSA did not apply because subject securities were uncovered, but making clear that "[w]e do not here modify *Dabit*").  The Eighth Circuit's pre-*Dabit* opinion in *Green v. Ameritrade, Inc.*, 279 F.3d 590, 598-99 (8th Cir. 2002) -- which held that SLUSA's "in connection with" requirement was not satisfied where the claim related to monthly subscription services for real time stock quotes -- does not warrant a different conclusion.  The Eighth Circuit has since limited *Green* to the extent it narrowly construed the "in connection with" requirement.  *Siepel*, 526 F.3d at 1127.  Moreover, the breach of contract claim at issue in *Green* was *not* inextricably intertwined with purchases and sales of securities, as is the case here, because it involved stock quotations rather than actual orders.  *Compare Green*, 279 F.3d at 598, *with* Compl. ¶ 1.

claims could tend to frustrate the statutory objective of establishing and monitoring the development of a national market system and would undermine the Commission's effort to assure the practicability of brokers achieving best execution.") (citing *Guice v. Charles Schwab & Co.*, 674 N.E.2d 282 (N.Y. 1996), *cert. denied*, 520 U.S. 1118 (1997)).  For that reason, numerous courts – including the highest courts of New York, Illinois, Pennsylvania and Minnesota – have found similar challenges to payment for order flow to be preempted on that basis.

      **1.**    **State Law Claims That Conflict With The Purpose And Objectives Of The Federal Regulatory Framework Are Preempted**.

Under the Supremacy Clause, U.S. Const. Art. VI, cl. 2, a state law may be preempted by federal law in three circumstances: where Congress (as in SLUSA) explicitly preempts state law ("express preemption"), where preemption is implied because Congress has occupied the entire field of law ("field preemption"), and where preemption arises from a conflict between federal and state law ("conflict preemption" or "obstacle preemption").  *See Capital Cities Cable Inc. v. Crisp*, 467 U.S. 691, 699 (1984); *see also Arizona v. U.S.*, 132 S. Ct. 2492, 2505 (2012) (referring to conflict preemption, and observing it is a "well settled proposition that a state law is preempted where it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"); *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153-54 (1982) ("Federal regulations have no less pre-emptive effect than federal statutes. . . . A pre-emptive regulation's force does not depend on express congressional authorization to displace state law.").  Preemptive effect is also accorded to regulations of self-regulatory organizations such as FINRA where their regulations are subject to SEC review and approval.[24]

---

[24]    *See, e.g.*, *Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*, 559 F.3d 772, 776-77, 780 (8th Cir. 2009) (concerning stock borrow rules approved by SEC); *McDaniel v. Wells Fargo Investments, LLC*, 717 F.3d 668, 676 n.7 (9th Cir. 2013) (NASD rules); *Myers v. Merrill Lynch & Co., Inc.*, No. 98-

For there to be conflict preemption, there need not be directly opposing duties between federal and state law that would render compliance with both a literal impossibility.  *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 379 (2000) (citations omitted) (even if the federal and state laws "share the same goals . . .[t]he fact of a common end hardly neutralizes conflicting means"); *Securities Indus. Ass'n v. Connolly*, 883 F.2d 1114, 1118 (1st Cir. 1989) ("a direct, facial contradiction between state and federal law is not necessary to catalyze an 'actual[ ] conflict', . . .") (citation omitted).  Instead, an irreconcilable conflict sufficient to give rise to conflict preemption will exist if state law undermines the federal regulatory framework or when state law "stan[ds] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress . . . ."  *Barnett Bank v. Nelson*, 517 U.S. 25, 31 (1996) (citation omitted). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and effects . . . that which needs must be implied is of no less force than that which is expressed."  *Crosby*, 530 U.S. at 373 (quotation omitted). Preemption under such circumstances is well-established.[25]

If a state law claim affects "an area where there has been a history of significant federal presence . . . there is no beginning assumption that concurrent regulation by the State is a valid exercise of its police powers."  *U.S. v. Locke*, 529 U.S. 89, 108 (2000); *see also Buckman Co. v. Plaintiff's Legal Committee*, 531 U.S. 341, 347-48 (2001).  Here, there can be no question that there is a "significant federal presence" and an important federal interest involved.  Congress has determined that the "*national* public interest" requires a "*national* market system" and a

---

3532, 1999 WL 696082, *8-9 &  n. 13 (N.D. Cal. 1999) (NASD rules), *aff'd* 249 F.3d 1087 (9th Cir. 2001) (all of the plaintiff's state law "claims were preempted by federal regulation of securities transactions"); *In re Application of Brenner*, 652 N.Y.S.2d 249, 252 (N.Y. App. Div. 1996) (NYSE rules), *motion for leave to appeal dismissed as moot*, 90 N.Y.2d 921 (1997).

[25]    *See International Paper Co. v. Ouellete*, 479 U.S. 481, 491-92 (1987); *Hillsborough Co., Fla. v. Automated Med. Labs, Inc.*, 471 U.S. 707, 713 (1985).

"*national* system for clearance and settlement of securities transactions."  15 U.S.C. § 78b

(emphasis added).  *See also*, *e.g.*, *Pet Quarters*, 559 F.3d at 780-81 (affirming dismissal of action

as preempted); *Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 707 (2d Cir. 1998); *Guice*, 674

N.E.2d at 286; *see also* Part IV(C)(3), *infra* (citing additional cases concerning payment for

order flow that were dismissed as preempted).

 As explained below, order flow payments and order execution are the subject of

extensive federal regulations.  *See* Part IV(C)(2), *infra*.  Those federal regulations, when applied

here, demonstrate that Plaintiffs' state law breach of contract claim conflicts with the regulatory

framework and must be preempted.  *See* Part IV(C)(3), *infra*.  Indeed, the resolution of Plaintiffs'

breach of contract claim necessarily would extend far beyond the parties' contractual

relationship, and would invade this federal regulatory framework.  And when faced with similar

state law claims that infringed upon this federal regulatory framework, the vast majority of

courts that addressed those claims dismissed them as preempted.  *See id*.

  **2.**  **Order Flow Payments And Order Execution Are The Subject Of Extensive Federal Regulation**.

 As explained further in Part II(B)-(C), *supra*, for decades, the SEC has studied and

regulated the practice of order flow payments and order execution.  *See also generally*, *e.g.*,

*Guice*, 674 N.E.2d at 287-88 (describing the extensive federal regulatory framework relating to

payment for order flow).

 This regulatory structure arose out of Congress' 1975 amendments to the Securities

Exchange Act of 1934, wherein "Congress directed the [SEC] to facilitate the establishment of a

prompt, accurate national clearance and settlement system to protect investors and the public

interest."  *Pet Quarters*, 559 F.3d at 776-77, 780.  *See also* 15 U.S.C. § 78k-1(a)(2) (2012)

(directing the SEC to establish such a system "in accordance with these findings"); *see* Part

31

II(B)-(C), *supra*.  Congress further instructed the SEC, "by rule or order, to authorize or require self-regulatory organizations to act jointly with respect to matters as to which they share authority under [the Exchange Act] in planning, developing, operating, or regulating a national market system[.]"  15 U.S.C. § 78k-1(a)(3)(B).

Pursuant to this delegation of power, the SEC has promulgated federal regulations addressing (i) disclosure of order execution and routing; (ii) payment for order flow; and (iii) execution requirements.  *See* Part II(B)-(C), *supra* (discussing the federal regulatory rules and regulations regarding these issues).  In addition to these regulations, the regulatory history reveals that the SEC has studied the potential conflicts of interest raised by payment for order flow, but rather than banning the practice, the SEC chose to regulate it through the process of mandated disclosures and an emphasis on "regular and rigorous" review of execution quality. *See* Payment for Order Flow, 1994 WL 587790, at *7-8.  Moreover, the SEC has long recognized that payment for order flow can result in benefits for retail investors, including in the form of "lower commission charges to investors, expeditious executions and enhanced services." Proposed Rule, Payment for Order Flow, Exchange Act Release No. 34-33026, 58 Fed. Reg. 52,934, 52,939-40, 1993 WL 403286, at *7 (proposed Oct. 6, 1993); *see also, e.g.*, Payment for Order Flow, 1994 WL 587790, at *7-8, *Guice*, 674 N.E.2d at 288 (addressing same).

The SEC and FINRA have hardly neglected this field; indeed, they have brought many enforcement actions for violations of this regulatory framework.  *See, e.g.*, *Geman v. SEC*, 334 F.3d 1183, 1190 (10th Cir. 2003) (affirming SEC finding that broker-dealer violated its duty of best execution by failing to disclose that its method of executing orders deprived customers of the possibility of getting a price better than the NBBO); *In re Scottrade, Inc.*, 93 S.E.C. Dkt. 1550, 2008 WL 2510611, at *1-2 (June 24, 2008) (settled action finding that retail broker

32

violated its duty of best execution because, contrary to representations to its clients, it did not

have written policies and procedures to assess liquidity at the market opening provided by

market centers to which it routed NASDAQ pre-open orders and therefore did not consider the

availability of executions that may have been superior to the NBBO for those orders).[26]

### 3. Plaintiffs' State Law Claim Conflicts With The Federal Regulatory Framework.

Plaintiffs allege that "TD Ameritrade neither 'consider[s] a wide variety of factors' in

order-routing nor routes its orders in the manner that is best for its customers."  (Compl. ¶ 2.)

Plaintiffs also assert that "TD Ameritrade's breaches of contract have caused economic injury . .

. insofar as Plaintiffs and the Class have been exposed to toxic high-frequency trading . . . [and]

have been further damaged because they have not received the best execution on their trades, but

rather the execution that was best for TD Ameritrade"  (*id.* ¶ 35).  But to give content and

context to the alleged contractual "promises," and to determine whether the federal obligation of

seeking "best execution" was satisfied and what "damages" resulted from not seeking "best

execution," the Court will need to look beyond the Client Agreement, to FINRA Rule 5310 (and

predecessor federal regulations and commentary), SEC Rule 10b-10, SEC Rule 606, SEC

Regulation NMS, and cases applying these rules and regulations.  This would involve the court

in interpreting an inherently federal framework under the auspices of state law.  *See Pet*

*Quarters,* 559 F.3d at 780-82 (affirming preemption of state law misrepresentation claims

regarding a federal approved stock borrowing program; "these claims are preempted because

---

[26]     *See also*, *e.g.*, *In re Morgan Stanley & Co., Inc.*, 90 S.E.C. Docket 1625, 2007 WL 1364323, at
*1-2 (May 9, 2007) (settled action finding that broker-dealer violated its duty of best execution by
embedding undisclosed mark-ups and mark-downs in retail orders for over-the-counter securities); *In re
Certain Market Making Activities on NASDAQ*, 68 S.E.C. Dkt 2693, 1998 WL 919673 (Jan. 11, 1999)
(settled action finding that NASDAQ market makers failed to provide best execution for their customers'
orders by favoring their own interests, or those of a cooperating market maker, over the interests of their
customers).

they seek a determination from a state factfinder that a program declared efficient in rules

approved under federal law was in fact not"); *see also generally NASDAQ OMX Group, Inc. v.*

*UBS Secs., LLC*, 770 F.3d 1010, 1020-23 (2d Cir. 2014) (affirming exercise of federal

jurisdiction in order-execution claim against NASDAQ market, reasoning that "although UBS's

claims for relief may invoke state law of contract and tort, the duty on which these claims turn—

and their particular scope as it pertains to UBS in participating in the Facebook IPO—necessarily

raises disputed issues of federal securities law" while claim purported to be based on listing

agreement, "the Services Agreement does not itself specify how NASDAQ was to fill and

confirm orders or otherwise conduct an IPO. Those obligations are delineated in NASDAQ's

own rules . . . whether a registered securities exchange such as NASDAQ has violated its

federally prescribed duty to operate a fair and orderly exchange necessarily raises a disputed

question of federal law").

      Plaintiffs' demand that TD Ameritrade be ordered to disregard payment for order flow in

routing orders and disgorge all order routing payments received is at odds with the federal

standard; federal law allows for broker-dealers to route orders to venues in exchange for payment

for order flow so long as they conduct "regular and rigorous review" of those sources to

determine whether there are any "material differences in execution quality." FINRA Rule 5310,

Supplementary Material .09(b) (broker must conduct a regular and rigorous review to determine

whether there are "any material differences in execution quality"). The Complaint nowhere

suggests that TD Ameritrade failed to conduct such a review or conducted one and disregarded

its conclusions; Plaintiffs merely recite statistical information provided under Rule 606 and a

draft study that does not analyze TD Ameritrade's actual order execution data. (Compl. ¶¶ 28-32

(referencing TD Ameritrade's relationship with certain market venues as reflected on the SEC

Rule 606 reports and a draft study about non-marketable limit orders).)  In adopting the

predecessor to SEC Rule 606, the SEC not only found that using Rule 606 statistics to hold

brokers liable for breaches of duty "would be contrary to the Commission's prior statements . . .

about the duty of best execution," but also explained that it "believes that the possibility of

multiple, inconsistent standards in interpreting this [statistical] information in relation to various

state law claims *could tend to frustrate the statutory objective of establishing and monitoring the*

*development of a national market system and would undermine the Commission's effort to*

*assure the practicability of brokers achieving best execution*."  Disclosure of Order Execution

and Routing Practices, Exchange Act Release No. 34-43590, 2000 WL 1721163, at *12.

(emphasis added) (*citing Guice*, 674 N.E.2d 282).  Under Plaintiff's own theory, TD Ameritrade

could be found in breach of best execution duties even if it complied with the best execution

requirements approved by the SEC, and on the basis of information the SEC itself does not

consider evidence of a best execution violation.  This would amount to "nothing more than a

complaint about the Commission approved . . . methods" for determining compliance.  *Pet*

*Quarters,* 559 F.3d at 781.

   Moreover, while Plaintiffs seek restitution or disgorgement of all alleged profits earned

from payment for order flow (Compl. ¶ 34 & p. 15), the SEC has never banned payment for

order flow as an improper payment or alleged "kickback."  Instead, the SEC required that

broker-dealers make disclosure regarding payment for order flow.  *See, e.g.*, SEC Transaction

Confirmation Rule, 17 C.F.R. § 240.10b-10 (2014); SEC Order Routing Disclosure Rule, 17

C.F.R. § 242.606 (2014).  Thus, Plaintiffs would apply a standard that deems illegal the very

practice the SEC has studied, evaluated, and chosen to allow, by seeking a judgment that the

acceptance of payment for order flow taints the execution of *all* orders.  *But see Shulick v.*

*PaineWebber, Inc.*, 722 A.2d 148, 149 (Pa. 1998) (preempting state law claims regarding

payment for order flow, where plaintiff "avers that the payments could have caused orders to be

placed through exchanges and dealers that did not provide the best execution possible in terms of

price, etc.").

      Requests for disgorgement of order flow payments, as Plaintiffs seek here, were at the

heart of the determination by numerous courts in the 1990s that suits seeking such a remedy

would effectively ban the practice of payment for order flow and were preempted: "[a]ny ruling

which implies that the order flow payments might have to be remitted to the customer on a case-

by-case basis would be impossible to fulfill and would require the termination of the practice of

order flow payments. . . . Thus, the remedy [Plaintiffs] seek could frustrate the objectives of the

SEC and Congress."  *Dahl v. Charles Schwab & Co.*, 545 N.W.2d 918, 925 (Minn. 1996)

(affirming federal preemption of state law claims relating to payment for order flow – "[a]

decision by this court affecting these payments will no doubt reach far beyond the borders of

Minnesota").  *See also id.* at 925-26 ("We believe that order flow payments are a useful

competitive tool and that a decision requiring them to be returned to the customer would have a

seriously negative impact on the efficacy of this tool.  In turn, given the complicated and intricate

nature of the securities industry, anything affecting a practice as widely utilized as this one will

have a significant impact on the securities markets nationwide. Whether this impact will be

positive or negative is not for this court to judge."); *Shulick*, 722 A.2d at 151 (preempting claims

for breach of contract and fiduciary duty relating to payment for order flow); *Orman v. Charles

Schwab & Co., Inc.*, 688 N.E.2d 620, 626 (Ill. 1997) ("Allowing plaintiffs to advance their

breach of fiduciary duty and contract claims would require the defendants to identify the nature

and calculate the value of order flow payments received so that plaintiffs' damages (the

improperly retained order flow payments) could be assessed" and doing so would have "deleterious effects to the National Market System" because it would "effectively bring the practice of order flow payments to a halt"); *Guice*, 674 N.E.2d at 291 (state law claims preempted by less restrictive SEC regulations permitting brokers to receive payment for order flow with proper disclosure, because, among other things, disclosures "which may be required under State common-law … inevitably will supplant the disclosure rules of the SEC"; enforcing the claims "would unavoidably result in serious interference with the accomplishment and execution of the full purposes and objectives of Congress . . . and would directly conflict with SEC regulations limiting the disclosure requirements regarding receipt of order flow payments.").[27]   In fact, courts have found preemption merely where a state-law cause of action would reduce the value of a benefit the federal framework allowed brokers and other financial institutions to retain[28] – as a rule disgorging order flow payments even where the federal best-execution regulations have been complied with would do.

The Nebraska Supreme Court, in *Zannini v. Ameritrade Holding Corp.*, 266 Neb. 492 (2003), distinguished the *Guice* line of cases on the grounds that the federal regulation at issue in *Zannini* (regarding "operational capability") was merely proposed and not yet enacted.  *Id.* at 504.  But this case involves the very situation that *Zannini* regarded as a proper case for preemption.  *Id.* at 503-04 (explaining that, in *Guice*, there were "explicit commission

---

[27]      *See also Eirman v. Olde Discount Corp.*, 697 So.2d 865 (Fla. Ct. App. 1997) (dismissing order flow payment action as preempted, based on the reasoning in *Guice*, *Orman* and *Dahl*); *McKey v. Charles Schwab & Co., Inc.*, 67 Cal.App.4th 731, 734 (Cal. Ct. App. 1998) (same, where "[t]he thrust of the complaint is that a broker which receives monetary and nonmonetary incentives from wholesale securities dealers will place its order with those dealers, without regard to the best interests of the customer.").

[28]      *See Levitin*, 159 F.3d at 704-07; *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 563-64 (6th Cir. 1998); *Estate of Braunstein v. Merrill Lynch, Pierce Fenner & Smith, Inc.*, 657 N.Y.S.2d 12, 13 (N.Y.App. Div. 1997), *app. dismissed*, 686 N.E.2d 1366, *app. denied*, 691 N.E.2d 630 (1997), *cert. denied*, 523 U.S. 1119 (1998).

regulations" concerning the Plaintiff's "complaints regarding order flow payments" and, as a result, the *Guice* court ruled that "New York common law was preempted because it could interfere with the regulations which exhibited the method by which the federal government sought to reach its stated goal regarding order flow"); *see also Knights of Columbus Council 3152 v. KFS BD, Inc.*, 280 Neb. 904, 911-14 (2010) (affirming dismissal of breach of contract claim where enacted regulatory rules regarding federal recordkeeping duties did not confer a private right of action).

Accordingly, application of state law to Plaintiffs' breach of contract claim would conflict with the federal laws regarding the national market system and the SEC's and FINRA's regulatory framework. *See, e.g.*, *Guice*, 674 N.E.2d at 290 ("When, thus, a State's regulation, through the imposition of common-law tort liability or otherwise, adversely affects the ability of a Federal administrative agency to regulate comprehensively and with uniformity in accordance with the objectives of Congress, 'then the state law may be pre-empted even though 'collision between the state and federal regulation may not be an inevitable consequence.''") (citing *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 310 (1988)).

For all of these reasons, Plaintiffs' claim must be dismissed as preempted by federal regulation of order routing and execution.

**D.      Alternatively, This Action Should Be Dismissed
         For Failure To State A Breach Of Contract Claim**.

In addition to preemption by both SLUSA and federal regulations, the Complaint fails to state a breach of contract claim and should be dismissed. To state a breach of contract claim under Nebraska law,[29] Plaintiffs must plead "the existence of a promise, its breach, damage, and compliance with any conditions precedent that activate defendant's duty." *168th and Dodge, LP*

---

[29]      Plaintiffs allege that their breach of contract claim is governed by Nebraska law. (Compl. ¶ 23; Client Agreement at § 14(k).)

*v. Rave Reviews Cinemas, LLC*, 501 F.3d 945, 950 (8th Cir. 2007) (quoting *Phipps v. Skyview Farms, Inc.*, 492 N.W.2d 723, 730 (2000)).  Where any of these elements is not adequately pled, a breach of contract claim cannot survive a motion to dismiss.  For the reasons that follow, Plaintiffs have not adequately pled the existence of any promise, its breach, or resulting damage, and for each of those independent reasons, the Complaint must be dismissed.

> **1.      Plaintiffs Fail To Plead The Existence Of A Contractual Promise**.

Plaintiffs contend that TD Ameritrade contractually "promised" to "consider a variety of factors in determining where to direct its orders" (Compl. ¶ 22), and, as a result of TD Ameritrade's purported failure to consider those factors, Plaintiffs contend that "they have not received the best execution on their trades" (*id.* ¶ 35).  Plaintiffs are wrong.

Significantly, the Nebraska Supreme Court has held that, under Nebraska law, a breach of contract claim cannot be premised on an obligation that the defendant was already required under law to perform.  *See Knights of Columbus*, 280 Neb. at 911-14 (affirming dismissal of breach of contract claim against broker-dealer, where plaintiff alleged that defendant violated NASD (now FINRA) recordkeeping duties, and agreeing with district court's conclusion that plaintiff "had attempted to circumvent" prior "cases that held NASD rules and securities exchanges rules do not confer a private cause of action for violations"); *see also, e.g.*, *Ashford v. Bank of America, N.A.*, No. 13-12153, 2013 WL 5913411, *4-5 (E.D. Mich. Oct. 31, 2013) (same in Michigan action, and collecting cases from courts in that state).

Thus, where, as here "regulatory rules [regarding best execution] are incorporated into a customer agreement, they do not bring with them a right to sue for an infraction."  *Gurfein v. Ameritrade*, No. 01cv9526, 2007 WL 2049771, at *3 (S.D.N.Y. July 17, 2007) (referring to predecessor of FINRA Rule 5310, and dismissing breach of contract claim premised on alleged failure to obtain best execution).  "Nor does it impose any contractual obligations on

[TD] Ameritrade." *Gurfein v. Ameritrade, Inc.*, 312 F. App'x 410, 413 (2d Cir. Feb. 27, 2009) (collecting New York cases); *see also Kurz*, 556 F.3d at 642 ("Some of these [regulatory] rules are the source of legal duties, and not revealing to investors a failure to comply with one's duties about transactions in their securities can lead to liability under the securities acts").

In any event, the language set out in Section 8(a) of the Client Agreement is not a promise, but an acknowledgement *by the client* of factors TD Ameritrade states it considers in routing its clients' orders for execution. Indeed, the text of the Client Agreement states "[y]ou consider," rather than "[y]ou promise." (Index of Evidence Ex. 1.B at 1.) Moreover, the factors listed are essentially the same as those provided under FINRA Rule 5310 regarding a broker-dealer's "Best Execution and Interpositioning" obligations, and as such are merely a restatement of the requirements of a federal regulation.[30]

Accordingly, and for this reason alone, Plaintiffs have not stated a breach of contract claim.

### 2. Plaintiffs Fail To Sufficiently Plead That TD Ameritrade Breached A Promise.

Even if the Court were to find that Section 8(a) is a promise, Plaintiffs have not sufficiently alleged that TD Ameritrade breached that promise. Plaintiffs allege that TD Ameritrade stated that it was utilizing an order routing process that it did not follow (Compl. ¶ 24), but Plaintiffs do not assert any well-pled facts concerning that process and instead focus

---

[30]    *Compare* Client Agreement § 8(a) (listing a number of factors that may be considered), *with* FINRA Rule 5310(a)(1) (requiring broker-dealers to "use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing conditions," and stating that "among the factors that will be considered" are "(A) the character of the market for the security (e.g., price, volatility, relative liquidity, and pressure on available communications); (B) the size and type of transaction; (C) the number of markets checked; (D) accessibility of the quotation; and (E) the terms and conditions of the order which result in the transaction[.]").

40

entirely on payment for order flow.  Rather, Plaintiffs allege conclusorily that "they have not received the best execution on their trades" because "TD Ameritrade neither 'consider[s] a wide variety of factors' in order-routing nor routes its orders in the manner that it is best for its customers."  (Compl. ¶¶ 2, 35.)  For the following reasons, these allegations are insufficient.

<blockquote>

a.   *Plaintiffs Do Not Assert Any Allegations Regarding The Factors That TD Ameritrade Failed To Consider In Routing Clients' Orders.*

</blockquote>

Plaintiffs contend that their claim is based on TD Ameritrade's failure to satisfy its best execution obligations, but the Complaint is entirely devoid of any allegations regarding TD Ameritrade's order routing process.  The duty of best execution requires a broker-dealer to "*seek*" best execution on clients' orders.  *See, e.g.*, Payment for Order Flow, 1994 WL 587790 at *3 n.15 ("A broker-dealer's duty to *seek* to obtain best execution of customer orders derives, in part, from the common law agency duty of loyalty, which obligates an agent . . . to exercise reasonable care to obtain the most advantageous terms for the customer.") (emphasis added).  The SEC requires brokers to satisfy this obligation by "assess[ing] periodically [in the aggregate] the quality of the markets to which it routes packaged order flow."  *Id.* at *6; *see also* Part II(B)-(C), *supra*.

Moreover, FINRA Rule 5310(a) requires TD Ameritrade to "use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions."  FINRA Rule 5310 also identifies several factors that are "considered in determining whether a member has used 'reasonable diligence'" (which factors are also set out in the Client Agreement), but Plaintiffs do not allege well-pled facts that TD Ameritrade failed to consider those factors.  The Complaint lacks any allegations whatsoever that, when engaging in "reasonable diligence," TD Ameritrade did not consider "the character of the market for the

41

security" (*e.g.*, price, volatility, and relative liquidity).  Likewise, the Complaint is devoid of any well-pled allegations that TD Ameritrade failed to consider other FINRA Rule 5310 factors, such as "the size and type of transaction," or "the number of markets checked," or "accessibility of the quotation," or "the terms and conditions of the order which resulted in the transaction."

FINRA Rule 5310 also includes Supplementary Material, which provides further guidance regarding a member's best execution obligations.  Supplementary Material .09 states, among other things, that a member must conduct a "regular and rigorous review" of execution quality.  Plaintiffs do not allege that TD Ameritrade failed to conduct a regulator and rigorous review of execution quality.

Further, lacking from the Complaint are well-pled facts concerning any of Plaintiffs' trades or identifying any venues where TD Ameritrade could have achieved better execution. *See also Gurfein*, 312 F. App'x at 412, 414 (2d Cir. Feb. 27, 2009) (affirming dismissal of breach of contract claim against TD Ameritrade predecessor regarding alleged representation that it would route trades to "the appropriate market," where the complaint "does not appear to contain nonconclusory allegations that there was an alternative exchange that was reasonably available to Ameritrade under the circumstances and that would have offered materially better overall execution").

> b.   *TD Ameritrade's Receipt Of Payment For Order Flow Is Not Inconsistent With Its Best Execution Obligations*.

Plaintiffs make the unremarkable allegation that "TD Ameritrade routes almost all of its customers' orders to order internalizers or exchanges that pay TD Ameritrade for its order flow" to suggest that TD Ameritrade's receipt of order flow payments is *necessarily* inconsistent with seeking best execution (*see, e.g.*, Compl. ¶ 28).  But Plaintiffs' conclusory suggestion is not actionable or supported by federal regulations and guidance regarding the receipt of such

payments.  For many years, the SEC has studied the intersection of best execution and the receipt of payment for order flow, and made clear that it "*does not believe [] a broker-dealer violates its best execution obligation merely because it receives payment for order flow*."  Payment for Order Flow, 1994 WL 587790, at *5 n.28 (SEC "believes that bulk order routing based, in part, on the receipt of payment for order flow is not, in and of itself, a violation of [best execution] duties").  As a result, instead of banning the practice, the SEC has provided guidance and enacted regulations and approved rules regarding a broker's best execution obligations and disclosure obligations relating to payment for order flow and order execution.  *See, e.g*., *id.* at *8 (explaining that banning payment for order flow would "represent a radical change to the industry," and concluding that disclosure is the appropriate response to the issues raised by that practice); SEC Rule 10b-10 (requiring payment for order flow disclosure in account statements and confirmations); *see also* Part II(B)-(C), *supra*.  Plaintiffs nowhere allege that TD Ameritrade failed to make any required disclosures under SEC or FINRA rules or regulations; instead, the Complaint purports to rely on TD Ameritrade's required disclosures.  (*See, e.g.*, Compl. ¶¶ 28-33 (citing TD Ameritrade's SEC Rule 606 Reports).)

Likewise, Plaintiffs' assertion that a broker has not sought best execution in instances where it may have received the most routing revenue offered is equally conclusory and not actionable.  (*See, e.g.*, Compl. ¶¶ 24.)  Indeed, the premise of Plaintiffs' theory is that the receipt of more order routing revenue from one market center over another is somehow incompatible with best execution obligations, but as explained, Plaintiffs assert no well-pled facts that TD Ameritrade did not seek best execution on client orders, in accordance with FINRA Rule 5310 or other regulatory obligations.  *See* Part IV(D)(2)(a), *supra*.  Plaintiffs also fail to make any plausible allegations about how or why TD Ameritrade was supposedly unable to satisfy its best

execution obligations if it also maximized revenue opportunities.

Moreover, the SEC has never said that, by routing orders to a market center that pays the most for order flow, the broker has failed to seek best execution.  Furthermore, Plaintiffs' allegations, which derive from their review of TD Ameritrade's Rule 606 reports (*see, e.g.*, Compl. ¶ 28), ignore the SEC's directive that statistics in Rule 606 Reports are not of themselves determinative of a broker's best execution obligations:

> [W]hile the order execution and routing disclosures will represent a significant step forward in the quality of information that is currently publicly available, *they alone will not provide a reliable basis to assess a broker-dealer's compliance with its duty of best execution*. Therefore, the resulting statistics, by themselves, do not demonstrate whether or not broker-dealers have complied with their legal duties to their customers, and *to conclude otherwise would be contrary to the Commission's prior statements, discussed below, about the duty of best execution*. Furthermore, the Commission believes that the possibility of multiple, inconsistent standards in interpreting this information in relation to various state law claims could tend to frustrate the statutory objective of establishing and monitoring the development of a national market system and would undermine the Commission's effort to assure the practicability of brokers achieving best execution.

*Final Rule: Disclosure of Order Execution and Routing Practices*, 2000 WL 1721163, at *12 (explaining Rule 11Ac1-6, predecessor to SEC Rule 606).[31]

> c.   *Plaintiffs' Characterizations Of Public Testimony Provided By A TD Ameritrade Executive Should Not Be Credited.*

Plaintiffs contend that Mr. Quirk's "Senate testimony [] is at the core of its theory." (Dkt. 25-1 at 14.)  However, Mr. Quirk's testimony does not imply, as Plaintiffs assert, that

---

[31]   Furthermore, the Rule 606 Reports cited by Plaintiffs (Compl. ¶¶ 29-31) state that the venues to which TD Ameritrade, Inc. routed orders paid wide ranging amounts for order flow.  (*See, e.g.*, Index of Evidence Ex. 1.C (stating that, during the first quarter of 2014, Citi Global Markets paid on average $0.0018 per share, that Citadel paid on average $0.0022 per share, and that Direct Edge paid on average $0.0035 per share); *see also id.* Ex. 1.A at (Mr. Quirk testified: "you will note in our 606s that we have routed to a number of exchanges in one quarter, and some of those exchanges would not be the exchanges which were paying the highest rate.").)  Plaintiffs refer to and quote from these Rule 606 Reports in their Complaint, *see* Complaint at ¶¶ 28-31. This exhibit is properly considered by this Court on a Motion to Dismiss because it is embraced by the Complaint and relied upon by Plaintiffs as the basis of their claim against TD Ameritrade.  *See* note 12, *supra*.

TD Ameritrade's "payment-for-order-flow payments overrode every other factor in TD Ameritrade's order routing decisions." Compl. ¶ 27; *see also* Part II(D), *supra* (reflecting that payment for order flow did not override other factors). Rather, the portions of the testimony to which Plaintiffs cite in support of this allegation (Compl. ¶¶ 27, 32) reflect that Mr. Quirk testified that TD Ameritrade's determination of best execution during the first quarter of 2014 for a single type of order (non-marketable limit orders) resulted in routing orders to two venues that paid the most. (*See* Index of Evidence Ex. 1.A at 48.) Moreover, as discussed in Parts II(B)-(C) and IV(D)(2)(b), *supra*, TD Ameritrade's receipt of payment for order flow or liquidity rebates does not determine its adherence to best execution obligations. Furthermore, it bears noting that Plaintiffs allege that all of their stock purchases or sales occurred in 2012, *i.e.*, well prior to the first quarter of 2014. (Compl. ¶¶ 4-5.)

> d.  *Plaintiffs' Allegations Regarding Statements In* Flash Boys *Should Not Be Credited.*

Plaintiffs also allege that, "[r]ather than 'consider a wide variety of factors' in its order routing, TD Ameritrade has, for many years, simply sold its order flow to the highest bidder" and "knowingly exposed its customers' orders to toxic high frequency trading." (Compl. ¶ 24.) In the subsequent paragraphs, the Complaint cites to portions of *Flash Boys* that discuss statements attributed to Chris Nagy, a former TD Ameritrade employee, in which Mr. Nagy purportedly told the author that payment for order flow was sold "under conditions of extraordinary secrecy" and "is as off-the-record as possible," and that high frequency traders viewed retail stock orders to be valuable and "easy kill." (*Id.*) Plaintiffs also allege that "Mr. Nagy suggested [] payment-for-order-flow payments overrode every other factor in TD Ameritrade's order routing decisions." (*Id.* ¶ 27.)

Plaintiffs' own summary of those statements, however, shows that none of the statements

attributed to Mr. Nagy "suggest" that TD Ameritrade "simply sold its order flow to the highest bidder," or that TD Ameritrade did not consider a wide variety of factors when routing client orders or that TD Ameritrade otherwise failed to seek best execution on client orders.  (*Id.* ¶¶ 25-27)  As the court in *Gurfein v. Ameritrade* observed, "according to the SEC Website, a broker-dealer satisfies its duty of best execution by evaluating orders in the aggregate and periodically assessing which competing markets, market makers, or electronic communications networks offered the most favorable terms of execution, without requiring an individual evaluation of each order"; here, the Complaint and the statements attributed to Mr. Nagy "make no claim that [TD] Ameritrade failed to do that."  *Gurfein v. Ameritrade, Inc.*, 2007 WL 2049771, at *4 (S.D.N.Y. July 17, 2007), *aff'd*, 312 F. App'x 410 (2d Cir. Feb. 27, 2009) (dismissing breach of contract claim against TD Ameritrade predecessor regarding alleged representation that it would route trades to "the appropriate market" but instead routed to only one market).

Moreover, while Plaintiffs allege that payments for order flow are subject to "conditions of extraordinary secrecy" (Compl. ¶ 25), Plaintiffs subsequently allege that TD Ameritrade publishes on SEC Rule 606 Reports required information regarding payments for order flow (*id.* ¶¶ 28-31).  Furthermore, Plaintiffs' allegations regarding high-frequency traders are a red-herring.  Plaintiffs do not allege that TD Ameritrade engages in high-frequency trading, that it controls any high-frequency traders, or that it participates in any manipulation by high-frequency traders.  Rather, Plaintiffs' own allegations state that TD Ameritrade is removed from any such conduct: TD Ameritrade routes orders to certain market-makers; certain of those market-makers transact with high-frequency traders; and based on *Flash Boys*, certain high-frequency traders attempt to engage in trading that Plaintiffs characterizes as "toxic."  (*Id.* ¶¶ 2, 24.)  Thus, Plaintiffs have not asserted well-pled facts that any TD Ameritrade Defendant engaged in

46

conduct that somehow "knowingly exposed its customers' orders" to any high-frequency traders, much less any that were "toxic."

In sum, Plaintiffs have failed to identify any actionable promise that TD Ameritrade has breached.

### 3.      Plaintiffs Fail To Plead Damages Flowing From A Breach Of Contract.

Plaintiffs do not allege any plausible facts to support their damages allegations.  Instead, Plaintiffs make the boilerplate assertion that they and the Class have suffered "economic injury . . . in an amount to be determined at trial" due to exposure to "toxic high-frequency trading" strategies and because Plaintiffs and the Class "have not received the best execution on their trades, but rather the execution that was best for TD Ameritrade."  (Compl. ¶ 35.)  As a result, Plaintiffs seek "restitutionary damages by requiring Defendants to *disgorge* the profits they have earned from their material and opportunistic breaches of contract."  (*Id.* at pp. 11 & 15 (emphasis added).)  These allegations are wholly conclusory, and "[i]n the absence of factual support for the plaintiffs' allegation of damages, the plaintiffs' complaint is insufficient to withstand a motion to dismiss under Rule 12(b)(6)."  *Grawitch v. Charter Comms. Inc.*, 750 F.3d 956, 960 (8th Cir. 2014).  Moreover, while Plaintiffs contend that they suffered losses as a result of TD Ameritrade's alleged conduct, Plaintiffs have not alleged that "there was an alternative exchange that was reasonably available to [TD] Ameritrade under the circumstances that would have offered materially better overall execution."  *Gurfein*, 312 Fed. Appx. at 412.

In addition, Plaintiffs' allegations that they have been damaged due to "expos[ure] to high-frequency trading and the associated adverse selection risk and increased risk of electronic front-running as well as other predatory high frequency trading strategies," (Compl. ¶ 35), are conclusory and fail to state a claim.  *See Grawitch*, 750 F.3d at 960.  Moreover, "[a]s a general rule, a party injured by a breach of contract is entitled to recover all damages which are

47

reasonably certain and which are naturally expected to flow from the breach.  The ultimate objective of a damages award is to put the injured party in the same position that the injured party would have occupied if the contract had been performed, that is, to make the injured party whole."  *EMS, Inc. v. Chegg, Inc.*, No. 8:11cv113, 2012 WL 5412956, at *3 (D. Neb. Nov. 6, 2012) (Bataillon, J.) (citations and internal quotations omitted).  Here, however, Plaintiffs do not identify any economic loss, much less any "factual support" for their contention that they suffered *any* economic loss on their orders based on TD Ameritrade's routing decisions.  *Grawitch*, 750 F.3d at 960.

Most improper is Plaintiffs' demand for disgorgement as a remedy for any breach of contract.  (Compl. at pp. 11 & 14.)  Nebraska does not recognize disgorgement as appropriate relief for a breach of contract claim.  *See Rambo v. Sullivan Re Group LLC*, No. A-05-1020, 2007 WL 2122172, at *8 (Neb. Ct. App. July 24, 2007) (for breach of contract claims, "Nebraska has not recognized disgorgement of the breaching party's profits as damages available to an injured party"); *see also Phipps v. Skyview Farms, Inc.*, 610 N.W.2d 723, 733 (Neb. 2000) ("In a breach of contract case, the ultimate objective of a damages award is to put the injured party in the same position he or she would have occupied if the contract had been performed, that is, to make the injured party whole.").

For each of the independent reasons stated above, Plaintiffs have failed to state a breach of contract claim.

## V. CONCLUSION

For the foregoing reasons, TD Ameritrade respectfully submits that its motion to dismiss should be granted, and requests that Plaintiffs' Complaint be dismissed with prejudice.

Dated this 24th day of March, 2015.

TD AMERITRADE, INC. and
TD AMERITRADE CLEARING, INC.,
Defendants

By: *s/ Victoria H. Buter*
  Thomas H. Dahlk #15371
  Victoria H. Buter #23841
  KUTAK ROCK LLP
  The Omaha Building
  1650 Farnam Street
  Omaha, Nebraska 68102-2186
  Telephone: (402) 346-6000
  Facsimile: (402) 346-1148
  tom.dahlk@kutakrock.com
  vicki.buter@kutakrock.com

  A. Robert Pietrzak *(admitted pro hac vice)*
  Alex J. Kaplan *(admitted pro hac vice)*
  Jackie A. Lu *(admitted pro hac vice)*
  SIDLEY AUSTIN LLP
  787 Seventh Avenue
  New York, New York 10019
  Telephone: (212) 839-5300
  Facsimile: (212) 839-5599
  rpietrzak@sidley.com
  ajkaplan@sidley.com
  jlu@sidley.com

  *Attorneys for Defendants*
  *TD Ameritrade, Inc. and*
  *TD Ameritrade Clearing, Inc.*

**CERTIFICATE OF SERVICE**

       I hereby certify that on March 24, 2015, I electronically filed the foregoing with the Clerk of the Court, using the CM/ECF system, which sent notification of such filing to the following attorneys registered with the CM/ECF system:

Matthew A. Lathrop
LAW OFFICE OF MATTHEW A.
LATHROP, PC, LLC
2215 Harney Street, Suite 200
Omaha, Nebraska  68102
Matt@LathropLawOmaha.com

Jeffrey C. Block
Joel A. Fleming
BLOCK & LEVITON LLP
155 Federal Street
Bostom, Massachusetts  02110
Jeff@blockesq.com
Joel@blockesq.com

Gregory C. Scaglione
Patrice D. Ott
KOLEY, JESSEN LAW FIRM
1125 South 103rd Street
Suite 800, One Pacific Place
Omaha, Nebraska 68124
greg.scaglione@koleyjessen.com
patrice.ott@koleyjessen.com

       By: *s/ Victoria H. Buter*
           Victoria H. Buter

50