**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| **JAY ZOLA and** **JERIMIAH JOSEPH LOWNEY,** | **8:14CV288** |
| **Plaintiffs,** | |
| **vs.** | **FINDINGS AND** **RECOMMENDATION** |
| **TD AMERITRADE, INC., and** **TD AMERITRADE CLEARING, INC.,** | |
| **Defendants.** | |

This matter is before the court on the defendants' Motion to Dismiss Putative Class Action Complaint and Request to Take Judicial Notice (Filing No. 44). The defendants filed a brief (Filing No. 45) and an index of evidence (Filing No. 46) supporting the motion. The plaintiffs filed a brief (Filing No. 47) opposing the motion. The defendants filed a brief (Filing No. 50) and an index of evidence (Filing No. 51) in reply.

## BACKGROUND

The plaintiffs challenge the defendants' practice of routing "virtually all" customers' orders to certain stock exchanges for trading based on a single factor: maximizing the payment-for-order-flow income the defendants receive, rather than a wide variety of factors. **See** Filing No. 1-1 - Complaint p. 1-2, 14. The defendants are a securities retail broker-dealer and its provider of trade execution and clearing services. *Id.* ¶¶ 16, 21. The plaintiffs were the defendants' customers, executing thirteen stock purchases or sales, between them, through the defendants during the period February 29, 2012, and November 12, 2012. *Id.* at 3. These two plaintiffs purport to represent all of the defendants' customers who placed non-directed orders over a five-year period. *Id.* at 12. The plaintiffs allege the defendants' routing practice constitutes a breach of a uniform client agreement. *Id.* at 2-3. The client agreement provides:

> [the defendants] consider a wide variety of factors in determining where to direct [client] orders, such as execution price, opportunities for price improvement (which is when an order is executed at a price that is more favorable than the displayed national best bid or offer), market depth, order size

> and trading characteristics of the security, efficient and reliable order handling systems and market center service levels, speed, efficiency, accuracy of executions, and the cost of executing orders at a market.

*Id.* at 2; Filing No. 46 - Ex. 1(B) Client Agreement § 8(a).

The plaintiffs allege a single claim for relief: breach of contract. **See** Filing No. 1-1 - Complaint p. 14. The plaintiffs explicitly state they, "do not assert claims for breach of fiduciary duty, misrepresentation, or violation of the federal securities laws." *Id.* ¶ 37. The plaintiffs allege breaches of contract caused them to suffer economic injury by being "exposed to toxic high-frequency trading and the associated adverse selection risk and increased risk of electronic front-running as well as other predatory high frequency trading strategies." *Id.* ¶ 35. The plaintiffs also allege they were "further damaged because they have not received the best execution on their trades, but rather the execution that was best for [the defendants]." *Id.* In this way, the plaintiffs contend the defendants were wrongly enriched. *Id.* at 8-11. Although the plaintiffs suggest their economic injury could be determined at trial, they seek "restitutionary damages by requiring Defendants to disgorge the profits they have earned from their material and opportunistic breaches of contract." *Id.* at 12, 15.

The defendants filed a motion to dismiss the plaintiffs' Complaint on three grounds. **See** Filing No. 44. Initially, the defendants assert the plaintiffs' claim is preempted by the Securities Litigation Uniform Standards Act of 1998 (SLUSA), 15 U.S.C. §§ 77p, 78bb(f). *Id.* Alternatively, the defendants argue the plaintiffs' claim is preempted by federal regulation. *Id.* Finally, the defendants contend the plaintiffs' complaint fails to state a claim for relief on the merits. *Id.*

For consideration of their motion, the defendants seek judicial notice of certain sections of the Federal Register and Code of Federal Regulations. **See** Filing No. 44 - Motion p. 1-2. Additionally, the defendants seek judicial notice of excerpts from a June 17, 2014, transcript for a hearing before a U.S. Senate subcommittee. *Id.* The plaintiffs do not object to taking judicial notice of these documents, which are embraced by the Complaint, but assert it would be error to assume the truth of the statements made during the hearing. **See** Filing No. 47 - Response p. 7 n.5.[1] In any event, as part of the court's review of the defendants' motion, the court may consider exhibits annexed to the

---

[1] All page number references correspond to the numbers assigned when filed in the CM/ECF system.

Complaint or incorporated by reference.  **See** Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); **Zayed v. Associated Bank, N.A.**, 779 F.3d 727, 732 (8th Cir. 2015); **see SEC v. Siebel Sys., Inc.**, 384 F. Supp. 2d 694, 699 n.6 (S.D.N.Y. 2005) (taking judicial notice of transcripts relied upon by complaint).  The court takes judicial notice of the exhibits identified not for the truth of the facts asserted therein, but solely to determine the content of the testimony and regulations.

The plaintiffs' Complaint relies on sources other than the plaintiffs' personal knowledge for many of their allegations.  The Complaint quotes or references the 2014 book Flash Boys written by Michael Lewis (Lewis).  **See** Filing No. 1-1 - Complaint ¶ 25. Lewis' book relies upon interviews with Chris Nagy (Nagy) who worked for the defendants until 2012.  **Id.**  Additionally, the Complaint references testimony given by Steven Quirk (Quirk), a senior executive for the defendants, before the U.S. Senate's Permanent Subcommittee on Homeland Security and Governmental Affairs, on June 17, 2014.  **Id.** ¶ 27; **see** Filing No. 46-2 Ex. 1(A).


## ANALYSIS

### A.    SLUSA Preemption

The court reviews dismissal of a state law claim based on SLUSA preemption as a dismissal for failure to state a claim.  **Kutten v. Bank of America, N.A.**, 530 F.3d 669, 670 (8th Cir. 2008).  Congress intended SLUSA, an amendment to the Securities Act of 1933 and the Securities Exchange Act of 1934, to preempt claims by plaintiffs eluding Federal law requirements and protections by filing specified types of actions in State court.  **Sofonia v. Principal Life Ins. Co.**, 465 F.3d 873, 876 (8th Cir. 2006) (**citing** H.R. Rep. No. 105-803 (Oct. 9, 1998) (Conf. Rep.)).  Specifically, Congress sought to curb perceived abuses of class action cases involving securities and enforce heightened pleading requirements.  **Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit**, 547 U.S. 71, 81-82 (2006).  Accordingly, SLUSA allows removal and "expressly preempts all state law class actions based upon alleged untrue statements or omissions of a material fact, or use of a manipulative or deceptive device or contrivance, in connection with the purchase or sale of a covered security."  **Dudek v. Prudential Sec., Inc.**, 295 F.3d 875, 879 (8th Cir. 2002); **see** 15 U.S.C. §§ 77p(b)-(c), 78bb(f)(1)-(2).

The plaintiffs concede they dispute only one element:  whether the action alleges the defendants (i) misrepresented or omitted a material fact or (ii) used or employed a manipulative or deceptive device or contrivance.  **See** Filing No. 47 - Response p. 14.

The plaintiffs contend their claim is a pure breach of contact claim alleging the defendants "signed a contract requiring [them] to consider a wide variety of factors in order routing and then breached that agreement."  **Id.**  In opposition, the defendants argue, although the plaintiffs deny they allege misrepresentations or omissions, the breach of contract claim involves misrepresentations or omissions, in substance.  **See** Filing No. 45 - Brief p. 31-35.  Specifically, the defendants contend the plaintiffs' allegations surround misrepresentations about the factors the defendants would consider when routing orders.  **Id.** at 32.  The defendants also rely on the plaintiffs' use of terms such as "'material and opportunistic' breaches of the agreement and 'blatantly' failing to 'consider a wide variety of factors in determining where to direct [client] orders' and, instead, 'knowingly exposed its customers' orders to toxic high frequency trading' in order to receive 'kickback' payments."  **Id.** (**quoting** Filing No. 1-1 - Complaint ¶¶ 2-3, 22, 24-26, 34-35).  Additionally, the defendants contend the plaintiffs' claim alleges, in substance, the defendants used or employed a manipulative or deceptive device or contrivance.  **Id.** at 36-37.  The defendants contend the plaintiffs' allegations the defendants received "kickbacks" and the purported scheme which exposed clients to adverse selection risk, electronic front-running, and other toxic high-frequency trading strategies are examples of the manipulative or deceptive devices or contrivances.  **Id.**

The court evaluates SLUSA applicability by employing a fair reading of the substance of the plaintiffs' allegations, rather than merely the name of the cause of action.  **Kutten**, 530 F.3d at 670; **Dudek**, 295 F.3d at 879 (upholding preemption dismissal when, although fraud allegations deleted, the "essence" and "substance" of the plaintiffs' fairly read complaint alleged misstatements and omissions).  Further, the court must focus on material facts, those which are factual predicates of the claim. **LaSala v. Bordier et Cie**, 519 F.3d 121, 141 (3d Cir. 2008).  "To be a factual predicate, the fact of a misrepresentation must be one that gives rise to liability, not merely an extraneous detail."  **Id.** (noting allegation of misrepresentation may be implicit or explicit).  "[W]hen one of a plaintiff's necessary facts is a misrepresentation, the plaintiff cannot avoid SLUSA by merely altering the legal theory that makes that

4

misrepresentation actionable." **Id.** (noting SLUSA preemption may apply "even if misrepresentation is not a legal element of the claim").

A breach of contract claim may survive SLUSA preemption. **See *Green v. Ameritrade, Inc.*,** 279 F.3d 590, 597-99 (8th Cir. 2002) (denying SLUSA preemption because although claim explicitly alleged misrepresentations it did not relate to acts in connection with the purchase or sale of a covered security). Moreover, not all breach of contract claims involve allegations of misrepresentations or omissions. ***Freeman Investments, L.P. v. Pacific Life Ins. Co.***, 704 F.3d 1110, 1115-16 (9th Cir. 2013) (denying SLUSA preemption for parties' dispute over contract interpretation disassociated with any allegations of fraud and allowing plaintiffs to eliminate references to hidden loads, knowing concealment, and wrongful conduct irrelevant to breach). In fact, "[t]he failure to carry out a promise made in connection with a securities transaction is normally a breach of contract. It does not constitute fraud unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform." ***Mills v. Polar Molecular Corp.***, 12 F.3d 1170, 1176 (2d Cir. 1993); **see *MDCM Holdings, Inc. v. Credit Suisse First Boston Corp.***, 216 F. Supp. 2d 251, 257 (S.D.N.Y. 2002) (denying SLUSA preemption where "MDCM only alleges that Credit Suisse signed numerous contracts in which it promised to do one thing but then did another" without allegations of improper intent); ***Gurfein v. Ameritrade, Inc.***, No. 04 Civ9526, 2006 WL 2959146 (S.D.N.Y. 2006) (denying SLUSA preemption absent fraud allegations in breach of contract claim for timing of trade execution).

"In ***Dabit***, the Supreme Court instructed that SLUSA should be read with the 'presumption that Congress envisioned a broad construction,' so that the most troublesome class actions would be subject to the PSLRA's procedural reforms." ***Siepel v. Bank of Am., N.A.***, 526 F.3d 1122, 1127 (8th Cir. 2008) (**quoting *Dabit***, 547 U.S. at 86). Despite the plaintiffs' attempt to deny they "assert claims for breach of fiduciary duty, misrepresentation, or violation of the federal securities laws" (Filing No. 1-1 - Complaint ¶ 37), the court may find the plaintiffs implicitly allege the defendants engaged in misrepresentations in connection with the breach of contract. Clear indicators of SLUSA preemption would be the use of "descriptive buzz words like 'disclosed,' 'undisclosed,' or 'secret'" in the other allegations. **See *Gwin v. Nationwide Life Ins. Co.***, No. 2:08CV59, 2008 WL 8945610, at *3 (N.D. Ala. Apr. 15, 2008).

5

Here the plaintiffs allege only one claim for relief.  Nevertheless the Complaint is sixteen pages long and references a 2014 book alerting the plaintiffs to "handshake deals" conducted by the defendants "under conditions of extraordinary secrecy" . . . "as off-the-record as possible."  **See** Filing No. 1-1 - Complaint ¶ 25.  The plaintiffs allege the defendants engaged in a practice of intentional conduct over time willfully, deliberately, opportunistically, and materially breaching the client agreement. Specifically, the plaintiffs allege the defendants have "for many years, simply sold its order flow to the highest bidder" thereby they "knowingly exposed . . . customers' orders to toxic high frequency trading."  **See** Filing No. 1-1 - Complaint ¶ 24.  Further, this conduct continued despite the defendants knowing their "customers' order flow was particularly vulnerable to high frequency traders."  **Id.** ¶ 26.  Finally, the plaintiffs' prayer for damages includes damages not ordinarily awarded in simple breach of contract cases.  The plaintiffs seek disgorgement of profits, not based on their actual economic injury, but based on the defendants' willful, deliberate, and opportunistic intent.  **Id.** ¶ 34. For these reasons the court finds a fair reading of the substance of the plaintiffs' allegations show more than merely extraneous detail suggesting alleged misrepresentations and omissions, but factual predicates giving rise to liability for both the claim for breach and, independently, for damages.  The court finds, however, the allegations are insufficient to show the plaintiffs allege the defendants used or employed a manipulative or deceptive device or contrivance.  Nonetheless, the plaintiffs' claim is preempted by SLUSA and should be dismissed.

## B.    Federal Regulation Preemption

The defendants argue resolution of the plaintiffs' breach of contract claim necessarily extends beyond the parties' contractual relationship to invade the federal regulatory framework governing order flow payments and order execution.  **See** Filing No. 45 - Brief p. 41.  The plaintiffs deny their claim is preempted because no conflict exists between the federal regulations and the claim.  **See** Filing No. 47 - Response p. 24.  Although the plaintiffs do not dispute order flow payments are permissible, they contend the defendants allowed the amount of the payments to override all other factors when making order routing decisions.  **Id.** at 24-25.  In reply, the defendants contend the plaintiffs attempt to add a motive-based standard to federal regulation best

execution requirements creating a conflict between federal and state law.  **See** Filing No. 50 - Reply p. 16-17.

"Ordinary preemption is a federal defense that exists where a federal law has superseded a state law claim.  Express preemption occurs where a federal law explicitly prohibits or displaces state regulation in a given field."  ***Johnson v. MFA Petroleum Co.***, 701 F.3d 243, 248 (8th Cir. 2012) (internal citation omitted).  "Preemption may also be applied in situations where a state [law] directly conflicts with federal law, or in limited circumstances where 'a federal law completely occupies the field of regulation so that by implication there is no room for state regulation and the coexistence of federal and state regulation is not possible.'"  ***Id.*** (**citing *Florida Lime & Avocado Growers, Inc. v. Paul***, 373 U.S. 132, 142-43 (1963) and **quoting *Mo. Bd. of Exam'rs for Hearing Instrument Specialists v. Hearing Help Express, Inc.***, 447 F.3d 1033, 1035 (8th Cir. 2006)); **see *Guice v. Charles Schwab & Co.***, 674 N.E.2d 282, 285 (N.Y. 1996) (noting preemption applies to State statutory or regulatory law and common law) (**citing *Freightliner Corp. v. Myrick***, 514 U.S. 280, 286-87 (1995)).  "Pre-emption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation."  ***La. Pub. Serv. Comm'n v. FCC***, 476 U.S. 355, 369 (1986).

The defendants appear to confine their argument to conflict preemption.  State law will conflict with federal law when "'compliance with both federal and state regulations is a physical impossibility' or when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  ***Qwest Corp. v. Minnesota Pub. Util. Comm'n***, 684 F.3d 721, 726 (8th Cir. 2012) (**quoting *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.***, 471 U.S. 707, 713 (1985)).  Otherwise, state law may coexist with the federal regulation to the extent they are not inconsistent.  ***Merrill Lynch, Pierce, Fenner & Smith v. Ware***, 414 U.S. 117, 137 (1973).

The potential conflict exists between the plaintiffs' breach of contract claim and the U.S. Securities and Exchange Commission's (SEC) implementation of Securities Exchange Act regulations.  Effective May 31, 2012, the SEC approved FINRA[2] Rule

---

[2] Financial Industry Regulatory Authority (FINRA) "enacts rules and publishes guidance in its role as regulator of securities firms and brokers."  **See** Filing No. 45 - Brief p. 12 n.3.

5310, known as the Best Execution Rule, which requires member firms, such as the defendants, to "use ***reasonable diligence*** to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions."   FINRA Rule 5310(a) (emphasis added).  Reasonable diligence is determined by examining such factors as:

> (A) the character of the market for the security (e.g., price, volatility, relative liquidity, and pressure on available communications);
> (B) the size and type of transaction;
> (C) the number of markets checked; [and]
> (D) accessibility of the quotation[.]

*Id.*  Moreover, the members are required to conduct a "regular and rigorous" review of the execution quality.  *Id.* Supp. Material .09.

> In reviewing and comparing the execution quality of its current order routing and execution arrangements to the execution quality of other markets, a member should consider the following factors:
> (1) price improvement opportunities (i.e., the difference between the execution price and the best quotes prevailing at the time the order is received by the market);
> (2) differences in price disimprovement (i.e., situations in which a customer receives a worse price at execution than the best quotes prevailing at the time the order is received by the market);
> (3) the likelihood of execution of limit orders;
> (4) the speed of execution;
> (5) the size of execution;
> (6) transaction costs;
> (7) customer needs and expectations; and
> (8) **the existence of internalization or payment for order flow arrangements**.

*Id.* (emphasis added).

The plaintiffs plead the defendants were contractually obligated to "consider a wide variety of factors," such as those listed above, but instead excluded all factors except the payment for order flow arrangements.  **See** Filing No. 47 - Response p. 24-25 (**citing** Filing No. 1-1 - Complaint ¶¶ 22, 24, 27-32).  The plaintiffs argue that because nothing in the regulatory scheme requires the defendants to disregard the

contractually obligated factors no conflict exists.  *Id.* at 25.  No conflict exists because the plaintiffs' claim is consistent with the regulatory requirements.

Comparison in this case revolves around the manner in which the defendants are required to examine the factors leading to execution quality.  Resting only on payment for order flow arrangements creates too narrow a perch.  Here, the contract obligates the defendants to "consider a wide variety of [enumerated] factors" while the regulations require the defendants to conduct a "rigorous" review of a variety of factors, including payment for order flow arrangements, as evidence of the defendants' reasonable diligence in determining the best market for the subject security.  The improper conduct alleged by the plaintiffs, failure to consider a wide variety of factors, runs afoul of both the client agreement and the relevant regulation.  The contract obligations do not diverge from the federally imposed standards.  Accordingly, compliance with the contract language creates no physical impossibility or obstacle to compliance with federal regulation or its purposes.

The cases relied upon by the defendants similarly suggest this result.  Those cases analyze the SEC's treatment of payment for order flow disclosures finding "State common-law agency principles inevitably will supplant the disclosure rules of the SEC" such that brokers merely complying with Federal regulations would be unable to avoid civil liability.  *Guice*, 674 N.E.2d at 291 (finding implied conflict preemption); **see also Shulick v. Painewebber, Inc.**, 722 A.2d 148 (Pa. 1998) (holding "federal regulation of the narrow subject of disclosure of order flow payments is so thorough that we have no difficulty in finding . . . that no room has been left for a state to impose additional requirements"); **but see Dahl v. Charles Schwab & Co.**, 545 N.W.2d 918, 925-26 (Minn. 1996) (finding state law payment for order flow consent requirements preempted because "given the complicated and intricate nature of the securities industry, anything affecting a practice as widely utilized as this one will have a significant impact on the securities markets nationwide").  Payment for order flow disclosures are not at issue in this case, nevertheless these cases instruct the application of preemption to securities matters.  Here mere compliance with the federally imposed standards would not create liability under the client agreement.  Likewise, mere compliance with the client agreement would not upset the balance of regulatory goals struck by the SEC rules.

Therefore, conflict preemption principles create no impediment to the plaintiffs' claim and the defendants' motion on this basis should be denied.

## C.   Breach of Contract

The defendants move to dismiss the Complaint, arguing the plaintiffs fail to allege sufficient factual matter to state a claim for relief that is plausible on its face in accordance with Federal Rule of Procedure 8.  **See** Filing No. 44 - Motion p. 1.  "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  ***Bell Atl. Corp. v. Twombly***, 550 U.S. 544, 555 (2007) (alteration in original) (**quoting** Fed. R. Civ. P. 8(a)(2) and ***Conley v. Gibson***, 355 U.S. 41, 47 (1957)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  ***Ashcroft v. Iqbal***, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  ***Id.***

While the court must accept as true the factual allegations, such imperative does not apply to legal conclusions.  ***Zayed***, 779 F.3d at 732-33.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  ***Iqbal***, 556 U.S. at 678.  A court engages in a context-specific exercise drawing "on its judicial experience and common sense" to determine whether a complaint states a plausible claim for relief.  ***Id.*** at 679.  "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'"  ***Twombly***, 550 U.S. at 556 (**quoting** ***Scheuer v. Rhodes***, 416 U.S. 232, 236 (1974)).

Under Nebraska law, "[i]n order to recover in an action for breach of contract, the plaintiff must plead and prove the existence of a promise, its breach, damage, and compliance with any conditions precedent that activate the defendant's duty."  ***Jackson Harmon Enters., LLC v. Ins. Auto Auctions, Inc.***, No. 8:13CV3194, 2015 WL 2061997, at *6 (D. Neb.  May 1, 2015) (**quoting** ***Phipps v. Skyview Farms, Inc.***, 610 N.W.2d 723, 730 (Neb. 2000)); **see** ***168th & Dodge, LP v. Rave Reviews Cinemas,***

*LLC*, 501 F.3d 945, 950 (8th Cir. 2007).  The defendants argue the plaintiffs "have not adequately pled the existence of any promise, its breach, or resulting damage."  **See** Filing No. 45 - Brief p. 49.

      1.      Promise

      The defendants do not quarrel with the existence and language contained in the client agreement.  Nevertheless, the defendants argue the plaintiffs' breach of contract claim alleges breach of an obligation already imposed by governing law, which cannot also support an independent contractual obligation.  *Id.*  The defendants assert the factors listed for the defendants' consideration in routing orders merely restates the federal requirements.  *Id.* at 50.  Specifically, the defendants contend the client agreement incorporates the Best Execution Rule set out in FINRA Rule 5310.  **See** Filing No. 50 - Reply p. 18-19.  Moreover, the defendants argue the factors are listed in a portion of the agreement such that they do not constitute promises by the defendants but only a client's acknowledgement of factors the defendants "state[ ] [they] consider[ ]," rather than "promise" they will consider.  **See** Filing No. 45 - Brief p. 50.

      Nebraska courts agree with the principle "a contract's implied incorporation of rules and regulations that govern a broker-dealer's dealings with an investor will not support a private cause of action when the rules and regulations themselves provide no private cause of action."  ***Knights of Columbus Council 3152 v. KFS BD, Inc.***, 791 N.W.2d 317, 326 (Neb. 2010) (**citing *Gurfein v. Ameritrade, Inc.***, 312 Fed. Appx. 410 (2d Cir. 2009)); **see *Gurfein v. Ameritrade, Inc.***, No. 04Civ9526, 2007 WL 2049771, at *3 (S.D.N.Y. July 17, 2007) (noting "when those regulatory rules are incorporated into a customer agreement, they do not bring with them a right to sue for an infraction").  In ***Knights of Columbus***, the plaintiff's complaint alleged "the defendants (1) agreed in the new customer agreements to comply with all federal and state laws and NASD bylaws and rules and (2) breached these contracts when they failed to comply with these laws."  ***Knights of Columbus***, 791 N.W2d at 325-26.

      The plaintiffs contend the Complaint alleges the existence of a promise explicitly contained in the client agreement.  **See** Filing No. 47 - Response p. 27.  Drafted in this way, a change in the law or its interpretation does not change the contract terms.  *Id.* at 29.  The plaintiffs argue the allegations in the Complaint differ from those cases cited by

the defendants because rather than only "incorporating" the federal regulations, the Complaint quotes the language of the client agreement, listing non-exclusive factors the defendants agreed to consider when routing orders, which in turn differs, if only slightly, from the regulations without simply restating them. *Id.* at 27-29. One disparate term concerns the timing for considering the factors: the plaintiffs appear to contend the client agreement "goes above and beyond" the periodic assessment requirement to actually mandate the defendants "make routing determinations on an order-by-order basis," a requirement expressly rejected by the SEC who "allows brokers to ***periodically*** assess the execution quality of its clients' order flow in the aggregate." **See** Filing No. 47 - Response p. 29 (emphasis added); **see also** Filing No. 45 - Brief p. 14 (**citing** Payment For Order Flow, Exchange Act Release No. 34,902, 59 Fed. Reg. 55,006-01, 55,008 n.26, 1994 WL 587790, at *5 n.26 (Nov. 2, 1994)).

The plaintiffs' Complaint and underlying contract differ significantly from those in the cases cited by the defendants. Here the underlying contract goes beyond an implied or explicit incorporation of the federal regulations. The contract explicitly identifies the factors the defendants agreed to consider without reference to any other source despite similarity to particular relevant regulations. Accordingly, the court concludes the Complaint alleges the existence of an underlying contract demonstrating the defendants' independent contractual obligation sufficient to avoid dismissal on this basis.

2.      Breach

The defendants argue the plaintiffs failed to plead factual allegations supporting a breach of the client agreement. **See** Filing No. 50 - Reply p. 21. The defendants contend the plaintiffs only rely on "manufactured inferences" and conclusions the defendants prioritized a single factor, which allegations do not constitute well-pled factual allegations sufficient to nudge the allegations from conceivable to plausible. *Id.* at 22-23.

The plaintiffs allege the defendants breached the client agreement by failing to "consider a wide variety of factors" in order-routing decisions. **See** Filing No. 1-1 - Complaint ¶¶ 47-48 (**quoting** Filing No. 46 - Ex. 1(B) Client Agreement § 8(a)). Stated another way, the plaintiffs argue the defendants "cannot prioritize payment for

order flow *to the exclusion of all other factors in its order routing decisions*."  **See**
Filing No. 47 - Response p. 24-25 (**citing** Filing No. 1-1 - Complaint ¶¶ 24, 27-32).
Specifically, the plaintiffs call the court's attention to six allegations from the Complaint:

- "TD Ameritrade has been routing virtually all of its customers' orders through whichever order internalizer or exchange is willing to pay TD Ameritrade the most money to receive its order flow;"
- "Rather than 'consider a wide variety of factors' in its order routing, TD Ameritrade has, for many years, simply sold its order flow to the highest bidder;"
- "[TD Ameritrade employee Chris Nagy] told [author Michael] Lewis that when TD Ameritrade sold its order flow, it did so under conditions of extraordinary secrecy. 'Most of the deals tend to be handshake deals . . . payment for the order flow is as off-the-record as possible.  They never had an email or even a phone call.  You had to fly down to meet;'"
- "TD Ameritrade [executive] Steven Quirk . . . effectively conceded that--as Mr. Nagy suggested--payment-for-order-flow payments overrode every other factor in TD Ameritrade's order routing decisions;"
- Quirk admitted that TD Ameritrade "virtually always" routed "orders to the markets that paid [TD Ameritrade] the most;" and
- "Reports that TD Ameritrade has filed with the Securities and Exchange Commission, pursuant to SEC Rule 606, confirm that TD Ameritrade routes almost all of its customers' orders to order internalizers or exchanges that pay TD Ameritrade for its order flow."

**See** Filing No. 47 - Response p. 30 (alterations in original) (**citing** Filing No. 1-1 - Complaint ¶¶ 1, 24-25, 27-28).

According to the defendants, the plaintiffs cannot maintain a breach of contract claim despite the plaintiffs' current allegations.  The defendants argue the plaintiffs fail to describe the defendants' order routing process or suggest any factors the defendants neglected to consider.  **See** Filing No. 45 - Brief p. 51-52.  Moreover, the defendants contend the plaintiffs fail to supply anything beyond conclusory statements suggesting the payments for order flow are inconsistent with the defendants' best execution obligations.  *Id.* at 52-53.  Such obligations, according to the defendants, are delineated by regulation for which no violations are alleged.  *Id.* at 52-53 (noting the plaintiffs do

13

not allege deficiencies in the defendants' compliance or disclosures under SEC and FINRA rules and regulations). The defendants contend the plaintiffs' supportable factual allegations, taken as true, without unsupportable irrational inferences unsuccessfully signify breach of the client agreement, requiring dismissal of the claim. *Id.* at 50-57. Specifically, the defendants contend the plaintiffs' characterizations of Quirk's testimony and Nagy's comments fall short of reasonable inferences plausibly entitling the plaintiffs to relief. *Id.* at 54-57.

The court agrees with the defendants after examining the Complaint as a whole, and, more narrowly, the six particular allegations identified by the plaintiffs. First, four of the allegations are related, the plaintiffs allege the defendants route "virtually all" customer orders to exchanges willing to pay the most for order flow. **See** Filing No. 47 - Response p. 30 (**citing** Filing No. 1-1 - Complaint ¶¶ 2, 27). In support of this allegation, the plaintiffs allege "Quirk admitted that TD Ameritrade 'virtually always' routed 'orders to the markets that paid [TD Ameritrade] the most." *Id.*; **see also** Filing No. 1-1 - Complaint ¶ 24 (alleging rather than consider a variety of factors the defendants "simply sold [their] order flow to the highest bidder" without an external reference). Additionally, the plaintiffs characterize Quirk's testimony as if he "effectively conceded . . . payment-for-order-flow payments overrode every other factor in [the defendants'] routing decisions." Filing No. 1-1 - Complaint ¶ 27 (**citing** the New York Times recounting of Quirk's testimony). On June 17, 2014, the Permanent Subcommittee on Investigations of the Committee on Homeland Security and Governmental Affairs of the U.S. Senate held a hearing on the topic of conflicts of interest, investor loss of confidence, and high speed trading in U.S. stock markets. **See** Filing No. 46-2 - Hearing Transcript (Tr.). Quirk spoke at the hearing, giving the following remarks, among others:

> Brokers are required to seek the most favorable terms reasonably available under the circumstances for client orders. At our firm we consider the opportunity to obtain a better price than currently quoted, the speed of execution, and the likelihood of execution, amongst other factors when making that assessment.
> We also give our clients a choice. Their orders can be routed using our proprietary order routing logic, or they can choose from a list of direct routing destinations.

> Finally, we work with multiple market destinations. Rather than internalize our client flow, we believe that routing all orders to the market is more transparent and better aligned with the needs of our clients. We select these market centers based on rigorous due diligence where execution quality is the top priority. After, and only after, a market satisfies our standards for best execution do we consider transaction costs or revenue opportunities.

Filing No. 46-2 p. 6 - Tr. 38.

After making his statement, Quirk answered questions, including:

> Senator LEVIN. Is the size of the rebate offered by an exchange a factor in determining where you route nonmarketable customer orders?
>
> Mr. QUIRK. The way that our committees and the people responsible for order routing approach this is they start with the best execution, and they would go through a list of variables that we should consider as hurdles. And in order to get to a point where the revenue sharing is even considered, those hurdles have to be cleared.
>
> Senator LEVIN. And the revenue sharing that you are talking about is the rebate?
>
> Mr. QUIRK. Correct, sir.
>
> * * *
>
> Senator LEVIN [continuing]. After you say you have looked at the other factors, and then you look at the rebate issue, my question is: Is the size of the rebate offered by an exchange a factor in determining where you route those nonmarketable customer orders?
>
> Mr. QUIRK. Yes. It would be the last factor. All things being equal, that would be a factor.
>
> Senator LEVIN. And so the greater the rebate, that would be where you would go if it is otherwise best market.
>
> Mr. QUIRK. Yes.

*Id.* at 10 - Tr. 46.

> Senator LEVIN. And so, again, your subjective judgment as to which market provided best execution for tens of millions of customer orders virtually always led you to route orders to the markets that paid you the most.
>
> * * *
>
> Mr. QUIRK. Virtually, yes.

*Id.* at 12 - Tr. 48.

The court finds Quirk's testimony, as referenced by the plaintiffs, insufficient to support a reasonable inference the defendants' payment-for-order-flow payments

overrode every other factor in their routing decisions.  Testimony, if true, that virtually all customer orders were routed through the highest paying markets, is potentially consistent with the plaintiffs' theory, yet, standing alone, fails to support the inference the defendants neglected to consider any of the other factors listed in the client agreement.  Moreover, even a cursory review of Quirk's contemporaneous hearing testimony directly and explicitly contradicts the plaintiffs' interpretation.  Quirk testified, "[a]fter, and only after, a market satisfies our standards for best execution do we consider transaction costs or revenue opportunities" and "[a]ll things being equal, [rebate size] would be a factor," but it "would be the last factor."  **See** Filing No. 46-2 p. 6, 10 - Tr. 38, 46.

The plaintiffs rely on an author's rendition of comments made by the defendants' former employee, Nagy.  **See** Filing No. 47 - Response p. 30 (**citing** Filing No. 1-1 - Complaint ¶ 25).  Specifically, the plaintiffs allege "Nagy told Lewis that when TD Ameritrade sold its order flow, it did so under conditions of extraordinary secrecy.  'Most of the deals tend to be handshake deals . . . payment for the order flow is as off-the-record as possible.  They never had an email or even a phone call.  You had to fly down to meet.'"  Filing No. 1-1 - Complaint ¶ 25.  The allegation, if true, does not support the plaintiffs' claim the defendants' breached the customer agreement.  As also noted by the plaintiffs, the defendants payments for order flow are public information.  In fact, the plaintiffs rely on an allegation the defendants admit in SEC filings they route "almost all" customers' orders to internalizers or exchanges who pay for order flow.  **See** Filing No. 47 - Response p. 30 (**citing** Filing No. 1-1 - Complaint ¶ 28).  The defendants' admission may be relevant, however, as with the allegation above, it does not lend facial plausibility to the plaintiffs' claim the defendants failed to consider the factors listed in the customer agreement before they routed orders.

The plaintiffs concede nothing prohibits the defendants from receiving payment for order flow and receipt of such payments is not necessarily inconsistent with best execution obligations.  **See** Filing No. 47 - Response p. 23-25, 31.  Nevertheless, the plaintiffs state their allegation the defendants route "virtually" all orders to venues paying for order flow *means* the defendants fail to consider any factor other than payment for order flow.  **See** Filing No. 47 - Response p. 30-31.  The plaintiffs allegations fail to support the inference the defendants neglected to consider any of the other factors

listed in the client agreement. The plaintiffs' focus on a single factor with objective and unopposed evidence confirming the defendants' reliance on the factor provides no reasonable inference about whether the defendants relied or neglected any other factor. Accordingly, the plaintiffs' claim the defendants breached the client agreement by failing to consider a wide variety of factors in order routing decisions is unsupported by well-pled factual allegations sufficient to avoid dismissal.

      3.     Damages

      The defendants argue the plaintiffs failed to plead factual allegations supporting damages for breach of contract. **See** Filing No. 45 - Brief p. 57. The defendants contend the plaintiffs do not identify any losses on their transactions, making the damages claim illusory. **See** Filing No. 50 - Reply p. 24. The plaintiffs assert they have pled damages flowing from the defendants breach and "several" alternative measures of those damages. **See** Filing No. 47 - Response p. 33-37. The plaintiffs allege they have suffered "economic injury" because they "have been exposed to toxic high-frequency trading and the associated adverse selection risk and increased risk of electronic front-running as well as other predatory high frequency trading strategies." **See** Filing No. 1-1 - Complaint ¶ 35. The plaintiffs also allege they were damaged because they did not receive the "best execution on their trades, but rather the execution that was best for [the defendants]." **Id.** Finally, the plaintiffs allege they are "entitled to disgorgement of [the defendants'] profits from these material and opportunistic breaches of contract." **Id.** ¶ 34.

      "In a breach of contract case, the ultimate objective of a damages award is to put the injured party in the same position the injured party would have occupied if the contract had been performed, that is, to make the injured party whole." **Gary's Implement, Inc. v. Bridgeport Tractor Parts, Inc.**, 799 N.W.2d 249, 257 (Neb. 2011). "The principle underlying allowance of damages is to place the injured party in the same position, so far as money can do it, as he or she would have been had there been no injury or breach of duty, that is, to compensate for the injury **actually sustained**." **J.D. Warehouse v. Lutz & Co.**, 639 N.W.2d 88 (Neb. 2002) (emphasis added). In Nebraska, the plaintiff has the initial burden of offering evidence sufficient to prove damages. **See Bedore v. Ranch Oil Co.**, 805 N.W.2d 68, 86 (Neb. 2011). "Generally,

17

while damages need not be proved with mathematical certainty, neither can they be established by evidence which is speculative and conjectural." *Sack Bros. v. Great Plains Co-op., Inc.*, 616 N.W.2d 796, 809 (Neb. 2000). "Damages which are uncertain, speculative, or conjectural cannot be a basis for recovery." *Hitzemann v. Adam*, 518 N.W.2d 102, 107 (Neb. 1994); see *American Cent. City, Inc. v. Joint Antelope Valley Auth.*, 807 N.W.2d 170, 181 (Neb. 2011). "Uncertainty as to the fact of whether damages were sustained at all is fatal to recovery." *Sack Bros.*, 616 N.W.2d at 809; see *Gary's Implement*, 799 N.W.2d at 259. Proof of damages "is sufficient if the evidence is such as to allow the trier of fact to estimate actual damages with a reasonable degree of certainty and exactness." *Pribil v. Koinzan*, 266 Neb. 222, 227 (Neb. 2003); see *Lesiak v. Central Valley Ag Co-op., Inc.*, 808 N.W.2d 67, 76-77 (Neb. 2012) ("requir[ing] enough evidence to provide a reasonable basis for the jury to estimate the extent of the damage"); *Gary's Implement*, 799 N.W.2d at 259 (An injured party will not be precluded from recovering because an exact computation is difficult.).

"One injured by a breach of contract is entitled to recover all its damages, including the gains prevented as well as the losses sustained, provided the damages are reasonably certain and such as might be expected to follow the breach." *Gary's Implement*, 799 N.W.2d at 257. "Thus, the nonbreaching party's general or direct damages are measured by the loss in value of the performance promised by the breacher--that is, the value of what was promised by the breaching party minus the value of the performance actually rendered. . . ." 24 Williston on Contracts § 64:1 p. 11 (West 2002). Although lost profits are generally too speculative and conjectural to permit, as with any other damages, such damages may be "recovered if the evidence shows with reasonable certainty both the loss and the extent thereof." *Id.* at 259.

> In prior Nebraska cases involving recovery of damages for lost profits, the focus has been on whether it was proven that it is reasonably certain such profits would have been realized, and that the lost profits can be ascertained and measured from the evidence introduced with reasonable certainty. Such lost profits must not be speculative, remote, or imaginary, but must be established with reasonable certainty by the evidence.

*El Fredo Pizza, Inc. v. Roto-Flex Oven Co.*, 261 N.W.2d 358, 364 (Neb. 1978).

Generally, a party "cannot recover damages merely for an 'increased risk' of harm." *Tillman v. C.R. Bard, Inc.*, No. 3:13CV222, 2015 WL 1456657, at *35 (M.D. Fla. Mar. 30, 2015) (noting jury could conclude medical device malfunction exposes patient to a real calculable risk of life-threatening harm). The plaintiffs here do not argue risk of future harm, which itself is subject to a higher level of court scrutiny. **See Holmes v. Countrywide Fin. Corp.**, No. 5:08CV205, 2012 WL 2873892, at *5-6 (W.D. Ky. July 12, 2012) (holding plaintiffs failed to allege a compensable injury for breach of contract absent direct financial harm when security breach caused risk of identity theft); *Giordano v. Wachovia Sec., LLC*, No. 06–476 JBS, 2006 WL 2177036, at *3 (D.N.J. July 31, 2006) (noting "because the plaintiff's injuries were solely the result of a perceived risk of future injury [identity theft], plaintiff had failed to show a present injury or reasonably certain future injury to support damages for any alleged increased risk of harm"); **Harms v. Laboratory Corp. of Am.**, 155 F. Supp. 2d 891, 912 (N.D. Ill. 2001) (granting summary judgment as to the plaintiffs' claim for "damages for risk of future harm" because "it is impossible to determine without speculation what sort of injury—if any—[would occur]"). Rather, the plaintiffs argue they were subject to past risk of harm without any suggestion of a cognizable injury actually sustained. **See** Filing No. 1-1 - Complaint ¶ 35. In any event, "the increased risk [of injury] must be based on evidence and not speculation, and, more importantly, the size of the award must reflect the probability of occurrence." *Dillon v. Evanston Hosp.*,771 N.E.2d 357, 371 (Ill. 2002) (noting future risk of injury as an element of damages).

In this case, the plaintiffs suggest a zero probability of occurrence, since no actual injury is alleged despite the time period encompassing the risk of harm having preceded this lawsuit. **See Iqbal**, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The record is devoid of conflicting evidence or even allegations supporting the plaintiffs' ability to prove the existence and likelihood of damages in the form of exposure "to toxic high-frequency trading and the associated adverse selection risk and increased risk of electronic front-running as well as other predatory high frequency trading strategies." **See** Filing No. 1-1 - Complaint ¶ 35. Similarly, the plaintiffs allege they were damaged because they did not receive the "best execution on their trades, but rather the

execution that was best for [the defendants]," but fail to suggest an economic harm occurred.  **See** *id.*

The plaintiffs allege they are "entitled to disgorgement of [the defendants'] profits from these material and opportunistic breaches of contract."  *Id.* ¶ 34.  The plaintiffs rely, in part, on the legal position of a party, the State of Nebraska, who is not a party to this action, in a case unrelated to the one at bar.  **See** Filing No. 47 - Brief p. 29 (**citing** *Kansas v. Nebraska*, 135 S. Ct. 1042, 1056 (2015)).  Such non-party's legal position is not binding, persuasive, or relevant to the current action.  "In a diversity case, decisions of the state's highest court are to be accepted as defining state law unless the state court 'has later given clear and persuasive indication that its pronouncement will be modified, limited, or restricted.'"  *M & I Marshall & Ilsley Bank v. Sunrise Farms  Dev., LLC*, 737 F.3d 1198, 1199-2000 (8th Cir. 2013) (citations omitted); **see** *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78-80 (1938).  "The highest court of each State, of course, remains 'the final arbiter of what is state law.'"  *Montana v. Wyoming*, 131 S. Ct. 1765, 1773 n.5 (2011).  Without governing precedent, the court must predict how the highest court would decide the issue.  *Jordan v. Safeco Ins. Co. of Illinois*, 741 F.3d 882, 887-88 (8th Cir. 2014).  To aid in the prediction, the court "look[s] to related decisions by the state's highest court and by the intermediate court of appeals."  *Palmer v. Illinois Farmers Ins. Co.*, 666 F.3d 1081, 1085 (8th Cir. 2012).

"Nebraska has not recognized disgorgement of the breaching party's profits as damages available to an injured party."  *Rambo v. Sullivan R.E. Group, L.L.C.*, No. A-05-1020, 2007 WL 2122172, at *8 (Neb. Ct. App.  July 24, 2007) (denying disgorgement for breach of contract claim and fraudulent misrepresentation) (**citing** 3 Dan B. Dobbs, Dobbs Law of Remedies § 12.7(4) (2d ed.1993)).  "[T]he practice in contract cases is . . . one who merely breaches a contract is not required to restore collateral profits or gains facilitated by the breach. . . .  The 'rule' merely permits the breacher to retain gains or profits that result from his own breach but that are not the result of the plaintiff's own performance."  *Rambo*, 2007 WL 2122172, at *8 (**quoting** Dobbs Law of Remedies at 170-71).  The Nebraska courts have recognized disgorgement as a remedy for unjust enrichment, which claim exists "only in the absence of an agreement between the parties."  *Washa v. Miller*, 546 N.W.2d 813, 818-19 (1996); **see** *Paltani v. Limited Fill Corp.*, No. A–10–951, 2011 WL 2724269, at *5 (Neb. Ct. App. July 12,

2011). The Nebraska Supreme Court specifically held, "[t]he doctrine does not operate to rescue a party from the consequences of a bad bargain. In other words, the enrichment of one party at the expense of the other is not unjust where it is permissible under the terms of an express contract." *Washa*, 546 N.W.2d at 819; see *Corona v. First Nat. Bank of Omaha*, No. 8:12CV89, 2014 WL 2558327, at *4 (D. Neb. June 6, 2014). Moreover, unjust enrichment, an equitable remedy, generally relies on fraudulent conduct or misrepresentations, which the plaintiffs' denied occurred in this matter. See *S.E.C. v. Brown*, 658 F.3d 858, 861 (8th Cir. 2011) (Loken, J., concurring) (recognizing disgorgement for securities fraud); see also *Rambo*, 2007 WL 2122172, at *8 (recognizing disgorgement of profits not commonly allowed for "mere breach of contract"); Filing No. 47 - Response p. 14-22 (describing this case as "[a] pure breach-of-contract").

Despite this law, the plaintiffs suggest profit disgorgement is an appropriate remedy when the breach of contract constitutes deliberate and willful conduct that is both material and opportunistic. See Filing No. 47 - Brief p. 36-37. The plaintiffs state this approach is "wholly consistent with the modern trend" citing *Coppola Enters., Inc. v. Alfone*, 531 So.2d 334 (Fla. 1988) and *Laurin v. DeCarolis Const. Co., Inc.*, 363 N.E.2d 675 (Mass. 1977). *Id.* In *Coppola Enters., Inc. v. Alfone*, the Supreme Court of Florida upheld an award for the profit from the sale of land to a subsequent purchaser after the seller breached a contract with an earlier prospective buyer. Nevertheless, the Eleventh Circuit Court of Appeals wrote, "under Florida law, disgorgement of profits earned is not a remedy for breach of contract." *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1245 n.26 (11th Cir. 2009) (limiting *Coppola Enters.* to "the specific context of contracts to purchase real property" and noting "[w]e have found no Florida authority suggesting that this principle permits disgorgement of profits in an ordinary breach of contract action."). In *Laurin*, on a claim for deliberate and willful breach of contract, the plaintiff's damages were found to be the defendant vendor's profit wrongfully made by sale of gravel from the land under construction. *Laurin*, 363 N.E.2d at 678. Because the property retained its value despite the wrongful removal of gravel, the court held the plaintiff was entitled to the profit as owner of the land, that is owner of the gravel, not as a punitive measure against the defendant. *Id.* at 679 (excluding value added by the defendant's labor in removing gravel). In any event, the court finds the

two cases inapposite and lacking modernity or a trend.  In each case the lost profits were, in fact, the plaintiffs damages placing them "in the same position [they] would have occupied if the contract had been performed, that is, to make the [them] whole," by awarding their "gains prevented."  **See** ***Gary's Implement***, 799 N.W.2d at 257.

By contrast, the plaintiffs here show no entitlement to the income received by the defendants.  The plaintiffs allege the amounts the defendants received are owed entirely to the plaintiffs' performance because without the plaintiffs' orders, no order flow payments exist.  **See** Filing No. 47 - Response p. 36.  However, unlike the cases cited by the plaintiffs, these plaintiffs lack a possessory interest in the relevant asset.  Here the asset is the order flow or the service, not the order itself.  The plaintiffs neglect to assert any gains prevented them which flowed to the defendants.

At this stage in the proceedings, although the plaintiffs are not required to come forward with evidence to support their allegations, the plaintiffs must set forth a plausible claim for relief.  The plaintiffs have not done that here.  The relevant case law does not support the plaintiffs' claims individually or for class treatment.  Moreover, in evaluating whether a plaintiff has suffered an ascertainable loss, the court may not rely on "hypothetical or illusory" losses or wholly subjective expectations of a potential risk with unrealized harm.  This is particularly true, where, as here, the express terms of the contract permit the defendants to consider and receive order flow payments.  **See** Filing No. 46 - Ex. 1(B) Client Agreement § 8(d) (The defendants "may receive remuneration from markets for directing orders to them.  The source and amount of these payments are available upon written request."); **see also** ***Washa***, 546 N.W.2d at 819 (holding "the enrichment of one party at expense of the other is not unjust where it is permissible under the terms of an express contract").  For these reasons,

### IT IS RECOMMENDED TO SENIOR JUDGE JOSEPH F. BATAILLON that:

The defendants' Motion to Dismiss Putative Class Action Complaint and Request to Take Judicial Notice (Filing No. 44) be granted as set forth above.

### ADMONITION

Pursuant to NECivR 72.2 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a

copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

**THE PARTIES ARE FURTHER ADMONISHED: For this matter the court is imposing page limitations and other specifications.** The plaintiffs, as a group, and the defendants, as a group, may not exceed 25 pages for briefs in support of (inclusive of any reply brief) or opposition to any objection pursuant to NECivR 72.2. The page limit includes optional use of a table of contents and authorities. All margins shall be one-inch on sides, top, and bottom. The page limit excludes the case caption and notice of service, which should exceed no more than one-half page at the beginning and end of the brief, respectively. Each page of a brief shall contain double-spaced text and single spaced footnotes. Typeface text shall be in 12-point Arial font. Footnote text may use 10-point font.

Dated this 10th day of August, 2015.

BY THE COURT:

 s/ Thomas D. Thalken
 United States Magistrate Judge